OFFICES OF

**PAVONE &**  **FONNER, LLP**

<u>A LAW PARTNERSHIP</u>

**BENJAMIN PAVONE, ESQ.**
**STATE BAR NUMBER 181826**
600 WEST BROADWAY, SUITE 700
SAN DIEGO, CALIFORNIA  92101
TELEPHONE: 619 224 8885
FACSIMILE: 619 224 8886
EMAIL: bpavone@cox.net

<u>ATTORNEYS FOR THE PLAINTIFF</u>

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **BENJAMIN PAVONE**<br><br>  **PLAINTIFF,**<br>**v.**<br><br>**GEORGE CARDONA, Chief Trial Counsel, Office of the Chief Trial Counsel of the State Bar of California;**<br>**LEAH WILSON, Executive Director of the State Bar of California;**<br>**ANDREW VASICEK, Senior Attorney, Office of Chief Trial Counsel,**<br><br>  **DEFENDANTS.** | **CASE NO.:** <u>'21 CV 1743 BTM BLM</u><br><br>**COMPLAINT FOR DECLATORY AND INJUNCTIVE RELIEF**<br><br>**I.   SYSTEMIC VIOLATIONS OF FEDERAL DUE PROCESS**<br><br>**II.   VIOLATION OF FIRST AMENDMENT**<br><br>**III.   VIOLATION OF FIRST AMENDMENT**<br><br>**IV.   VIOLATION OF FIRST AMENDMENT**<br><br>**V.   VIOLATION OF FIRST AMENDMENT** |

Left margin (vertical): **PAVONE & FONNER, LLP** 600 W. BROADWAY, STE. 700 SAN DIEGO, CALIFORNIA 92101

Line numbers: 1–28

1

2

3

4

5

6

7

8

9

10

11

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

I.    INTRODUCTION.................................................................. 5

II.   PARTIES............................................................................. 10

III.  BASIS FOR FEDERAL JURISDICTION ............................ 10

IV.   PROCEDURAL HISTORY OF THIS LITIGATION.............. 11

V.    STATEMENT OF UNDERLYING *MARTINEZ* FACTS ..................... 12

VI.   FEDERAL CONSTITUTIONAL DEFECTS IN
      THE STATE BAR SYSTEM .................................................. 13

      A. Meaningless Standards. ................................................ 13

      B. Girardi Scandal ............................................................ 14

           1. Facts ..................................................................... 14

                 Table 1 – Girardi (Partial) Fraud/Malpractice
                 Case Inventory ............................................... 19

           2. Implications ......................................................... 22

           3. The State Bar Downplays the Scandal....................... 22

           4. Relevance of the Scandal to OCTC's Docket............ 24

      C. Selective Prosecution ................................................... 25

                 Table 2 – OCTC Case Breakdown............................ 27

      D. Disregard of Constitutional Limitations........................ 28

      E. Weak Pretrial Procedures. ............................................ 28

      F. Refusal to Acknowledge Legitimate Pretrial Challenges ........... 29

      G. Illegal Cost Trap ......................................................... 29

      H. Meaningless Court System. .......................................... 30

VII.  THE CHARGES IN STATE BAR COURT ............................ 31

      A. Count 1 – Succubistic Adoption of the Defense Position ............. 31

      B. Count Two – Thwarting Appellate Review........................ 33

      C. Counts Three and Four - Intellectual Dishonesty .................. 35

VIII. FIRST CLAIM FOR RELIEF – DUE PROCESS.................... 38

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

A.  Corruption. ............................................................................................... 39

B.  Meaningless Standards. ......................................................................... 39

C.  Selective Prosecution.  ........................................................................... 39

D.  Disregard for Constitutional Limitations.  ........................................ 39

E.  Insufficient Pretrial Procedures.  ......................................................... 40

F.  Refusal to Respect Legitimate Pretrial Procedures.  ........................ 41

G.  Illegal Cost Trap. ..................................................................................... 43

    1.   Constitutional Invalidity of the Statute and Rule.................................. 43

    2.   Summary Imposition of Costs is Illegal. ............................................. 45

    3.   Challenge to Reasonableness of OCTC Cost Schedule........................ 49

    4.   Challenge to Investigator Costs ........................................................... 50

    5.   Inability to Minimize Cost Exposure ................................................... 51

H.  Meaningless Legal Rulings. ................................................................... 52

    1.  The Rulings in State Bar Court  ............................................................ 52

        Table 3 – Inventory of Rulings ................................................... 52

        Table 4 – Detail of Underlying Briefing...................................... 53

        Table 5 – Substantive Rulings in State Bar Court .......................... 54

I.  Bootstrapping............................................................................................ 56

IX.    SECOND CLAIM FOR RELIEF – NDC COUNT 1 .......................................... 58

    A.   The Meaning of the Phrase the "Ruling's Succubistic Adoption
       of the Defense Position" is Limited by the English Language to
       a Non-Sexual – and Therefore Uncontroversial – Criticism
       of the Ruling. .................................................................................... 58

    B.   Assuming the Word Were Intended to Imply or Refer
       to the Judge as a Succubus, This is still Not an Actionable
       Wrong Given the Plainly Hyperbolic Nature of the Comment ............... 60

       1.  Derivative Gender Insults ................................................................... 60

    C.   B&P 6068(B) Is Unconstitutional.  It is Unenforceable in Light
       of the Irreconcilable Nature of the Almost Infinite Range of
       Criticisms that May Cause A Person To Feel "Disrespected.".................. 62

1     1. B&P 6068(b) is Overbroad ................................................ 62

2     2. B&P 6068(b) is Vague. ................................................. 67

3 X.  THIRD CLAIM FOR RELIEF – NDC COUNT 2 ................................. 68

4 XI.  FOURTH CLAIM FOR RELIEF – NDC COUNT 3 ............................ 69

5 XII. FIFTH CLAIM FOR RELIEF – NDC COUNT 3 ................................ 70

6 XIII. REQUEST FOR DECLARATORY RELIEF ...................................... 71

7 PRAYER FOR RELIEF ............................................................................. 71

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

# I.

## INTRODUCTION

1.     The California State Bar operates a court system to enforce the concept of ethics, complete with prosecutors, judges and trials.  This system imposes extraordinary consequences, not just in reprimanding, suspending, fining, and sometimes ending careers via disbarment, but by marking targeted attorneys with its findings of ethical culpability and then publicizing such information in an easily-accessible, highly-visible format, in perpetuity.

2.     In addition, the Bar proactively publicizes its discipline activity on social media, in contrast to other administrative systems regulating professionals, thus putting targets of its system in a particularly vulnerable position, by not only interrupting their careers, but by proactively electing to inflict maximum reputational damage in order to publicly showcase its supposed effectiveness as an ethics regulator.

3.     But this system is, fundamentally, a sham.  It does not act to separate the ethical lawyers from the unethical ones.  It acts to separate politically connected ones from politically unconnected ones.  It serves the interests of those with power at the expense of those without.  It is a system based on muscle, not merit.  And most importantly, the heavy burden of a pending ethics prosecution almost exclusively falls on solo and small-firm practitioners, for the simple reason that they are the easy targets.

4.     Solo practitioners and small firms are the lawyers for the poor; for the desperate; for individuals; for your neighbor; for your grandmother; for your kid; for the oppressed.  We grind for them, often with little hope of being paid.  We fight for them, often against long odds.  We resist the lumbering weight of heavy-handed systems searching for a sliver of daylight for our individual clients to run through for survival.  We are the grunts in the trenches.  We are the ones that answer our own phones.  We are the ones that go the distance, often wrecking ourselves in the process.  We are the heart and soul of this profession.

5.     Yet, because OCTC can literally charge targeted attorneys with anything that subjectively bothers it, since the rules governing ethics enforcement are infinitely vague and infinitely overbroad, it finds numerous reasons to constantly sue solos and small-firm lawyers, and at the same time, finds just as many reasons to not charge lawyers at big firms or other politically connected organizations.

6.     Consequently, powerless solo and small-firm practitioners suffer the full brunt of prosecutorial enforcement after committing comparative ethical misdemeanors and infractions – or no offense at all – while the ethical felons at law firms get exempted time and again from similar or larger misconduct.

7.     The State Bar's court system also does not appear to take serious legal arguments seriously and does not put out legally competent rulings in response to such arguments, again announcing that the system is based on muscle, not merit.

8.     Rather, at least as demonstrated in this case, rulings consist of cursory "brush-offs" that mask the fact that OCTC's charges are themselves invalid, unconstitutional, and in fact, under the State Bar's own broad set of charging parameters, unethical to have been filed in the first place.

9.     Thus, instead of protecting the public from lawyers that are truly unethical, the system acts as a service to provide a competitive advantage or political weapon for those with power over, and influence within, this system, by only denigrating the easy targets – solos and small-firm practitioners.

10.     It is almost impossible to dream up a more cringeworthy example of this dysfunction in the State Bar system than the Girardi scandal.  Before Girardi, if you had asked a typical Bar target what offense would completely discredit OCTC and the State Bar, a target would likely report a situation in which it exempted an attorney who misappropriated $20,000, $50,000 or $100,000 of client money, while a solo or small-firm attorney was charged with some comparative triviality, like non-misappropriation-related trust account mistakes.

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

11.   Not even an imaginative attorney would have dreamed that an attorney could have entrenched himself so deeply into OCTC's DNA that he could literally steal millions of dollars of client money over the course of 30 years, with complete and total impunity from ethical inconvenience.

12.   The term "corruption" only begins to cover the multi-tiered dysfunction inherent in a system that routinely charges attorneys with ethical infractions, everything from problematic statements in court to sloppy legal practice to trust accounting mistakes, and subjects them to draining, protracted and expensive legal proceedings, while having completely exempted the single greatest ethical offender in California legal history, one who committed more serious misconduct than the State Bar's entire 500-case docket combined, all the while doing it under OCTC's nose – or as the known information suggests, with its consent.

13.   On top of the scandal, the State Bar system also serves as a cottage enterprise for the benefit of employees of its system, by constructing an unconstitutional cost trap. Its procedures are far too weak and impotent to permit even invalid NDC charges to be dismissed prior to trial, and as a result, it then imposes illegal and unconstitutional one-way cost shifting in striking sums of money ($20,000 for a two-day trial) on those who proceed to its almost invariably futile trial system.

14.   Even in the few cases where the attorney prevails at trial, at a minimum, it subjects Bar targets to a full run through its system because of these weak and unconstitutional pretrial procedures, which thereby either depletes the attorney's assets through defense fees and/or depletes him through the punishments it substantively inflicts after finding him guilty.

15.   With the vast majority of cases being objectively the ethical equivalent of an infraction or misdemeanor, the State Bar's system is effectively meting out felony-level punishments for misdemeanor-level wrongs and this functionally results in a system that does not accomplish its public service mission.  Rather, it serves the beneficiaries of the

system and affirmatively harms the weak, often in serious disproportion to the ethical wrongs actually at issue.

16.   This grand dysfunction occurs in a half-dozen unconstitutional particulars, which can be summarized by the following list:

(1)   **Corruption/Girardi Scandal**
Corruption of a legal system goes to the very heart of its function.  As reflecting by the disturbing quantum of malfeasance associated with the Girardi scandal, and in light of OCTC's refusal to either publicly disclose its details in order to allow public participation in understanding the dysfunction and reform process, it has resisted the matter, and for all we know, the same dynamics still exist.

(2)   **Selective Prosecution/Equal Protection**.  Although Girardi is the kingpin example of the State Bar's selective exemption of the rich and powerful, it is hardly the only example of the pervasive felony-caliber misconduct committed by attorneys at big or powerful law firms that is minimized, ignored or exempted by the State Bar system, while targeting solo and small-firm practitioners for their every misdemeanor.

(3)   **Meaningless Standards**.  The standards to charge an attorney with an ethical offense are limitless.  OCTC can charge attorneys with an ethical offense for any violation of any state law, any violation of any federal law, any violation of the Constitution, or any event that is not even illegal but merely contravenes OCTC's subjective perception of "justice itself," as well as any acts that it subjectively views as immoral, disrespectful, dishonest or corrupt.

(4)   **Disregard of Constitutional Limitations**.  OCTC does not appear to respect or analyze the constitutional limitations of its charges before filing suit.

(5)   **Insufficient Pretrial Procedures**.  Rule 5.124 motions to dismiss in State Bar Court are not interpreted to require real legal analysis for charges that are invalid or unconstitutional.

(6)   **Refusal to Recognize Legitimate Evidence-Based Challenges**.  Even when Plaintiff constructed a legitimate MSJ-comparable procedure based on the Bar's own rules and procedures, the State Bar Court system refused to address or even acknowledge the argument, after eight motions presented to it.

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

(7) **Illegal Cost Trap**.  The Bar's trial system imposes an illegal trap founded in cost notions, by imposing automated, invented, one-way costs in various unconstitutional particulars.

(8) **Meaningless Court System**.  Federal law establishes that it is a due process violation if a particular court system is effectively a meaningless pretense.  After 11 court rulings in this case undergirded by serious, detailed legal briefing, not one of them resulted in a competent or thoughtful ruling according to the standards applicable to rank-and-file state superior court judges.

17.     On the underlying merits, and as detailed herein, all of Plaintiff's statements fall within the First Amendment.  Counsel was entitled to have them dismissed on this basis in State Bar Court.  If that Court was unwilling to live up to minimum standards to qualify as a legitimate court by issuing rulings that are appropriate for the seriousness of the legal arguments raised, it must be enjoined in a forum that respects the law and the U.S. Constitution in a traditional way.

18.     That said, the *Younger* doctrine ordinarily bars federal cases that seek to interrupt a state-based criminal or quasi-criminal proceeding.[1]  However, a federal court may intervene in a proceeding based on exceptional circumstances.[2]

19.     The above list of serious and illegal dynamics, which chronicle the corrupted function of a large state disciplinary agency in over a half-dozen different ways qualify this case, and this Court system, to be exempted from the *Younger* doctrine under the *Dombrowski* exception in order to permit federal review of the State Bar system's constitutional non-compliance.

20.     Accordingly, this Court should assume jurisdiction over this matter and permanently enjoin the pending State Bar proceedings to review the above list of serious constitutional defects in the system.

---

[1]  *Younger v. Harris*, 401 U.S. 37, 45 (1971).
[2]  *Dombrowski v. Pfister*, 380 U.S. 479, 487-488 (1965).

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

## II.

## PARTIES

21.     Plaintiff Benjamin Pavone (Pavone, Plaintiff, undersigned counsel, counsel, or narrated in the first person) is a 26th year attorney, licensed to practice law in the State of California in good standing in this and all California federal courts, with no record of discipline or any other failure of compliance.  By trade and practice, counsel is a civil litigation attorney, with a background in complex civil rights, appellate and general civil litigation.

22.     Defendant George Cardona is believed to be the current Chief Trial Counsel for the Office of the Chief Trial Counsel of the State Bar of California.

23.     Defendant Leah Wilson is the Executive Director of the State Bar of California.

24.     Defendant Andrew Vasicek is denominated as a "Senior Attorney, Office of Chief Trial Counsel," and is the current prosecuting attorney in Plaintiff's case.

25.     Defendants Cardona and Wilson are the current policy makers and leaders of the State Bar of California, and as the individual head representatives of the organization, are responsible for the State Bar system's federal compliance in the manner alleged in this complaint.

26.     These three defendants are the logical individual state actors that must be enjoined in order to bring the state agency's illegal practices and procedures into federal compliant and enjoin Plaintiff's particular case as prohibited by the First Amendment.

## III.

## BASIS FOR FEDERAL JURISDICTION

27.     Title 42 United States Code section 1983 provides that every person who, under color of law, causes another to be deprived of any of their constitution rights or protections under federal law may be the subject of an action seeking appropriate relief, including injunctive relief, and may file suit in federal district court.

28.     At all times, Plaintiff was and is a San Diego-based practicing attorney.

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

29.     As defendants do business throughout the state and conduct substantial activity by hailing attorneys located all over the state into their preferred forums in Los Angeles and San Francisco, this is a proper venue pursuant to 28 U.S.C. § 1391(b).

30.     Plaintiff seeks declaratory and injunctive relief, to wit, that certain aspects of the rules and practices of the California State Bar disciplinary system are illegal, unconstitutional and in fact represent unethical violations, and that as such, the State Bar's particular proceedings against Plaintiff be temporarily and then permanently enjoined.

# IV.

## PROCEDURAL HISTORY OF THIS LITIGATION

31.     This litigation started as a labor dispute in *Martinez v. O'Hara*, Orange County Superior Court, Case No. 30-2012-00614932, filed in November 2012.  The case was litigated for five years to a modest individual damage judgment entered on February 21, 2017, after 17200 class certification and an interim appeal were denied.  A post-trial request for fees was denied.  The judgment was appealed to the Fourth District, Division Three, in Case No. G054840, which affirmed it on February 28, 2019.  Martinez petitioned to the California Supreme Court in S255071, which denied the matter on June 12, 2019.

32.     In the wake of the finality of the judgment, on August 11, 2020, the State Bar's Office of Chief Trial Counsel charged Plaintiff with four counts of violating B&P 6068(b), in its version of a charging document called a "Notice of Disciplinary Charges" or NDC, in State Bar Case SBC20O30496.  The docket of that action is 45 pages long and contains 101 individual entries as of this writing.

33.     Plaintiff initially responded with a federal action filed the same day as the NDC, filed in the Central District, Case No. 2:20-cv-07193 FMO (PDx), but a TRO was denied given *Younger* and counsel thereafter dismissed that action without prejudice.

34.     Meanwhile, in State Bar Court, a motion to dismiss the NDC filed a month later, on September 18, 2020, was denied in the Hearing Department on November 25,

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

2020, a writ was denied in the Review Department on February 18, 2021, and the Supreme Court denied review on May 26, 2021.

35.     After remittitur, Plaintiff brought a second round of motions to dismiss in late July and early August, 2021 on different procedural grounds, which were denied on August 27, 2021 by the Hearing Department.  Petitioner filed four writs to the Review Department on September 9, 2021, which were denied before OCTC's opposition papers were even due, on September 16, 2021.  Petitioner did not appeal this time to the California Supreme Court, since it almost never accepts discipline cases.

## V.

## STATEMENT OF UNDERLYING *MARTINEZ* FACTS

36.     In 2012, Plaintiff filed suit for Fernando Martinez after Martinez suffered a sexual harassment experience working for an Orange County real estate agent named Stephen O'Hara.

37.     Martinez ultimately recovered just over $10,000 in damages and secured a capitulation for O'Hara's to shut down the fraudulent, predatory headhunter website that lured Martinez into O'Hara's orbit.

38.     After trial, Martinez subsequently moved for the recovery of attorney's fees.  On November 30, 2016, the trial court denied the motion in its entirety, by essentially arguing that the sexual harassment litigation at issue had been pointless and that undersigned counsel had not maintained sufficiently precise billing records.  Judgment was entered on February 21, 2017.

39.     That ruling contains numerous legal errors.  Subsequently, Plaintiff fought an appellate battle to reverse the judgment in detailed filings to the Fourth District Court of Appeal, Division Three, in an opening appellate brief, a reply brief, a Petition for Rehearing, and a Petition for Review to the California Supreme Court.  However, no relief came and the judgment was affirmed.

40.     On February 28, 2019, the Fourth District Court of Appeal, Division Three, had filed its opinion, publishing part.  The published part referred counsel for an

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

ethics prosecution for a statement made in a 2017 notice of appeal that in relevant part *(i)* called the OC trial court ruling a 'succubistic adoption of the defense position,' *(ii)* for counsel's arguments that theorized that the judgment had not been not served at avoid appellate review, and *(iii)* for arguing that the trial court's ruling was intellectually dishonest.[3]  On the same day, Division Three also filed a complaint to the State Bar of California.

## VI.

## FEDERAL CONSTITUTIONAL DEFECTS IN THE STATE BAR SYSTEM

### A.  Meaningless Standards.

41.     The standards to charge an attorney with an ethical offense are meaningless.  OCTC takes the position that it can charge attorneys with an ethical offense for any violation of any state law, any violation of any federal law, any violation of the Constitution, and any event that is not even a violation of law as long as OCTC considers it a violation of "justice itself," all under the rubric of B&P 6068(a), as well as any act that it subjectively views as immoral, disrespectful, dishonest or corrupt under similarly overbroad statutes.

42.     Consequently, and for example, attorneys have been charged with ethical offenses for not paying a court reporter bill; for contacting immigration in a civil case involving an undocumented opponent; and for trying in earnest to civilly compromise a criminal case with an unrepresented criminal defendant.  None of these things strike one as the kind of transgression that the public thinks of when they think about unethical lawyers.

43.     Rather, they think of prosecutors that do not disclose exculpatory evidence to secure a wrongful conviction; of lawyers that shield corporations from their misconduct under the attorney-client privilege; and of lawyers that bury key evidence in discovery to thwart a plaintiff's case.

---

[3]   *Martinez v. O'Hara* (2019) 32 Cal.App.5th 853, 855.

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

44.     However, since these real ethical wrongs are usually committed by (big firm) attorneys that OCTC does not have the political will to prosecute, the State Bar prosecutorial system settles to libel small-firm and solo attorneys with ethical marks by resort to any transgression at all, including trivialities of the legal business, or anything else that technically constitutes a violation of law (and sometimes not even) including the statements involved in this case, in which no client was harmed and does not involve counsel's relationship with the class OCTC is supposed to protect – members of the public.

45.     As one court commented about a comparably meaningless system, "Judicial history does not record that anyone ever beat that rap. A saint would have difficulty avoiding jeopardy under that provision during any given 24-hour period."[4]

## B. Girardi Scandal

### 1. Facts

46.     Thomas Girardi was admitted to practice in 1965 and operated until March 9, 2021 (over 50 years) as a Los Angeles civil attorney with an unblemished State Bar record.[5]  His prominence in the legal community was reportedly elevated when he reached a landmark settlement in a 1992 chemical exposure case against Lockheed.[6]  This positioned him to act as one of the white knight law firms that assisted Attorney Ed Masry, chronicled in the movie *Erin Brockovich*, to reach that case's remarkable toxic tort settlement in 1996.[7]

47.     In 2002, allegations of client fund misappropriation first started to surface about the Lockheed case.  As reported by the Times:

> Lockheed workers came to believe 'millions and millions' were missing, as one of their attorneys wrote in a 2002 letter, and filed suit against Girardi.  He insisted he had done nothing

---

[4]  *In re S* (1977) 69 Cal.App.3d 866, 870.

[5]  *See* Exhibit 23.

[6]  Exhibit 1 [Peltz, James, "*Lockheed Settlement Ends Workers' 5-Year Legal Battle…*" Los Angeles Times (July 7, 1992).]; Exhibit 19:9-10

[7]  *See* Exhibit 19:10.

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

wrong, but he refused to make his bookkeeper available for a deposition. In what would become a pattern in such cases, he brushed aside demands for access to his firm's books and other financial records for more than a year — even in the face of three court orders.[8]

48.     True or not, misappropriation of client funds is well-known to be the capital offense of the State Bar ethics universe,[9] so any whiff of accusation along these lines, particular the seven-figure amounts claimed by the Lockheed clients, should have constituted a four-alarm fire for State Bar investigators and prosecutors.  Yet, the State Bar did not take any known action.[10]

49.     From 2005-2008, Attorney Girardi acted as a State Bar appointee to the California Judicial Council,[11] and along with reported ties to Democratic politicians, he thereby apparently acquired a level of influence in the selection and vetting of California judges and bar officials.[12]

50.     In 2008, Luis Gutierrez on behalf of the Lockheed plaintiffs filed a *class action* lawsuit accusing Girardi of many millions of dollars in misappropriated client recoveries.[13]  Gutierrez proposed to represent <u>*over 500 cheated clients*</u>.[14]  If the State Bar detected this massive allegation of attorney misconduct, it took no known action.

51.     In 2009, Howard B. Miller, a lawyer at Girardi's firm, Girardi Keese, became the president of the California State Bar.[15]  When Joseph Dunn, the State Bar's

---

[8]   *See* Exhibit 19:11.
[9]   *See Hitchcock v. State Bar* (1990) 48 Cal.3d 690, 708 [multiple instances of misappropriation of client funds would ordinarily 'result in a recommendation of disbarment without further discussion'…]
[10]  *See* Exhibit 18.
[11]  *See* Exhibit 20.
[12]  *See* Exhibit 19:13, 19:27.
[13]  *See* Exhibit 3.
[14]  *See* Exhibit 3, ¶ 10.
[15]  *See* Exhibit 19:24-25.

then executive director, was accused of misusing State Bar funds to pay for a Bar business trip, Girardi mooted the problem by paying Dunn's $5,000 expense.[16]

52.     Meanwhile, as of May 2010, Attorney Miller was still the State Bar's president. From about 2003 to that point in 2010, Attorney Girardi and his colleague Attorney Walter Lack were trying to collect a $489 million default judgment issued by a Nicaraguan court entered on behalf of 465 workers against Dole, the produce company, in relation to a toxic chemical used at certain of its banana plants.[17]

53.     However, the *Dole* judgment was entered against the wrong entity: it was entered against "Dole Food Corporation," not Dole Food Company, the latter its accurate name for purposes of American collection.  Ultimately, through a series of permutations to convert the Nicaraguan judgment to an enforceable American one, the Ninth Circuit eventually sanctioned Girardi and Girardi Keese $125,000 in a published opinion in July 2010, based on misrepresentations to the Court about the judgment.[18]

54.     After referring the matter to a special prosecutor in 2016, the State Bar declined to initiate an enforcement action.[19]  Protest ensued:

> The public will never have confidence in the State Bar if it goes after attorneys who have never been sanctioned, admonished, or held in contempt or responsible for the reversal of a trial, and gives a pass to lawyers who have been found to have committed fraud upon the court, and sanctioned over 300.000 dollars in Federal Court. [Tom Girardi].[20]

55.     During Girardi's problems with the *Dole* case, in 2010 he "bankrolled a lavish retirement bash for the chief justice of the state Supreme Court [then, Ronald George], which oversees the bar, even booking crooner Paul Anka to perform."[21]

---

[16]  *See* Exhibit 19:4, 19:29.

[17]  *Franco v. Dow Chemical* (9th Cir. 2010) 611 F.3d 1027, 1030-1035.

[18]  *Id.*, at 1067.

[19]  Exhibit 14:26.

[20]  Exhibit 5:1. Other firms and lawyers were also sanctioned in this case. The total figure was $390,000 of which $125,000 was allocated to Girardi Keese. (*Franco*, 611 F.3d 1027, 1034, 1067.)

[21]  Exhibit 19:4.

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

56.     On top of that, Girardi flew an entire orchestra of LA legal musicians to play at the Las Vegas event and he received accolades for his exciting generosity within the California Bar Journal, the organization's periodical.[22]

57.     In 2011, Girardi was the subject of another published appellate opinion critical of his ethics, this time by the California Second District Court of Appeal, from the *Gutierrez* Lockheed case.[23]  Lockheed involved a settlement pool of $131 million dollars.[24]  As against Girardi's statute defense for a case that dated back to 1988, the Second District nevertheless found that the *Gutierrez* class action could go forward on behalf of the disaffected clients.[25]

58.     Once again, there is no public record that the State Bar investigated, initiated a prosecution, or imposed any punishment for what would be the ethics equivalent of a mass shooting,[26] while the State Bar appears to have simultaneously continued with business as usual in litigating against and ultimately suspending less prominent attorneys for such infractions as mailing solicitations to prisoners.[27]

59.     Undeterred by the Bar, in June 2013, Girardi scammed former client Jaime Ruigomez, a burn victim, out of a personal injury recovery in the amount of approximately $11 million.[28]

60.     Meanwhile, Girardi continued his efforts to ingratiate himself with the organization and was evidently seeking a stature within it as a person so entrenched in its good graces that he became untouchable as a practical matter.[29]

61.     As observed by the Times:

---

[22]  Exhibit 4:2 [reflecting that the event was a "special reception for the retiring Chief Justice Ronald George and outgoing State Bar President Howard Miller"].

[23]  *Gutierrez v. Girardi* (2011) 194 Cal.App.4th 925, 929-932, 936.

[24]  *Gutierrez v. Girardi* (2011) 194 Cal.App.4th 925, 929.

[25]  *Id.*, at 936.

[26]  *See* Exhibit 23.

[27]  *See In re Venie* (2010) 2010 Calif. Op. Lexis 10, *2-4.

[28]  Exhibit 26:6.

[29]  *See* Exhibit 19:5 ["There was open talk at the agency about whether the legal titan's connections had shielded him from discipline"].

> The newspaper … found that Girardi cultivated close relationships with bar officials that at times appeared improper. Agency staffers received annual invitations to a Las Vegas legal conference, where Girardi hosted over-the-top parties at the Wynn casino featuring Jay Leno and other celebrity entertainers, according to attendees, event programs and an internal bar investigation.[30]

62.     By 2015, Attorney Girardi graduated his relationship from one of patronage to one of indirect bribery:

> He forged a particularly tight relationship with a bar investigator named Tom Layton. Over the decade and a half Layton worked at the bar, Girardi routinely treated him to pricey meals at the Jonathan Club, Morton's and the Palm, according to Layton's sworn testimony. The investigator rode on Girardi's private jet and two of his children got jobs at Girardi Keese, according to the testimony and an online resume. When he and his wife were sued by the contractor building their "dream house," Girardi provided years of free legal work… .[31]

63.     In January 2015, 28 women accused Girard of misappropriating over $12.5M of their recovery in a hormone replacement therapy case.[32]  Once again, if the Bar was alerted to, or otherwise detected the matter, it took no known action.

64.     In February 2016, also arising out of the *Lockheed* case, Paul Kranich sued Girardi alleging civil RICO and other serious fraud-related misconduct for Girardi's history of misconduct, all of which clearly involved moral turpitude.[33]  Once again, the State Bar does not appear to have taken notice, nor acted in any public way.

65.     In March, 2019, Girardi scammed former client Christina Fulton out of $729,000.[34]

---

[30]  *See* Exhibit 6 [In 2013, Girari Keese's candidate was among 20 winners out of 140 applicants for a State Bar scholarship, yet another tie to the organization].

[31]  *See* Exhibit 19:5.

[32]  *See* Exhibits 8-9.

[33]  Exhibit 7.

[34]  Exhibit 25.

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

66.     That same year, also in 2019, he cheated yet another client, a celebrity identified as C.F., out of an undisclosed sum for her case recovery.[35]

67.     About a year later, based on a settlement in early 2020, Girardi was once again accused of misappropriating client funds from the Boeing 737 Lion Air plane crash, this time with optics so appalling that Chicago attorney Jay Edelson characterized his conduct as:

> …resort[ing] to embezzling the proceeds of settlements that should have been directed to his clients – including, as the basis for this Complaint, the widows and orphans who lost loved ones in the tragic crash of Lion Air Flight 610 – in order to continue funding his and Erika's lavish Beverly Hills lifestyles.[36]

68.     Still insulated by OCTC, on March 5, 2020, Girardi cheated yet another client, Judy Selberg, out of several hundred thousand dollars.[37]  A partial inventory of professional misconduct cases filed against Girardi is reported below:

| | | | **TABLE 1**<br>**GIRARDI (PARTIAL) FRAUD/MALPRACTICE**<br>**CASE INVENTORY** | | |
| --- | --- | --- | --- | --- |
| **NO.** | **FILE DATE** | **PLAINTIFF CASE NAME** | **CASE NO.** | **COMMENT** |
| 1. | 1986-12-16 | Juday | LASC C629091 | |
| 2. | 1991-12-04 | Seiler | LASC BC043635 | 1991-12-04 – "Other" malpractice |
| 3. | 1994-10-20 | Pech | LASC BC114788 | 1994-10-20 – "Other" malpractice |
| 4. | 1995-01-30 | Clement | LASC BC120988 | 1995-01-30 – "Other" malpractice |
| 5. | 1995-03-15 | Sandoval | LASC BC123764 | 1995-03-15 – "Other" malpractice |
| 6. | 1996-02-02 | Vance | LASC BC143830 | 1996-02-02 – "Other" malpractice |
| 7. | 1996-07-15 | McLeod | LASC BC153781 | 1996-07-15 – "Other" malpractice |
| 8. | 1996-07-19 | McLeod | LASC BC154069 | 1996-07-19 – "Other" malpractice |

---

[35]   Exhibit 24.
[36]   *See* Exhibit 14, ¶ 3.
[37]   Exhibit 22.

| | | | TABLE 1 GIRARDI (PARTIAL) FRAUD/MALPRACTICE CASE INVENTORY | |
|---|---|---|---|---|
| NO. | FILE DATE | PLAINTIFF CASE NAME | CASE NO. | COMMENT |
| 9. | 1998-04-28 | Berman | LASC BC190116 | 1998-04-28 – "Other" malpractice |
| 10. | 1999-10-14 | Aloni | LASC BC218443 | 1999-10-14 – Legal malpractice suit. |
| 11. | 2001-06-11 | Waksberg | LASC BC252131 | 2001-06-11 – Legal malpractice suit. |
| 12. | 2001-10-03 | Anzures | LASC VC035337 | 2001-10-03 – Legal malpractice suit. |
| 13. | 2002-10-10 | Adelman | LASC BC283119 | 2002-10-10 – Sued for fraud. |
| 14. | 2002-10-11 | Jane Roe | LASC BC283198 | 2002-10-11 – Sued for fraud. |
| 15. | 2002-10-11 | Martino | LASC SC074611 | 2002-10-11 – Sued for fraud. |
| 16. | 2002-12-31 | Fettig | LASC BC287926 | 2002-12-31 – Legal malpractice suit. |
| 17. | 2003-05-23 | Structured Systems | LASC BC296133 | 2003-05-23 – Legal malpractice suit. |
| 18. | 2004-08-27 | Oehler | LASC BC320730 | 2004-08-27 – Legal malpractice suit. |
| 19. | 2006-02-21 | James | LASC BC347718 | 2006-02-21 – Sued for fraud. |
| 20. | 2006-05-22 | Waksberg | LASC BC352749 | 2006-05-22 – Sued for fraud. |
| 21. | 2008-10-23 | Gutierrez | LASC BC400560 | 2008-10-23 – Class action BFD suit. |
| 22. | 2011-06-06 | Prakashpalan | LASC SC112882 | 2011-06-06 – Legal malpractice suit. |
| 23. | 2010-07-23 | Salerno | LASC BC442213 | 2010-07-23 – Legal malpractice suit. |
| 24. | 2011-10-28 | Demeter | LASC BC472263 | 2011-10-28 – Legal malpractice suit. |
| 25. | 2012-03-29 | Dydzak | LASC 30-2012-00558031 | 2012-03-29 – Other PI Case |
| 26. | 2012-04-20 | Gutierrez | LASC BC400560 | 2012-04-20 – Class action BFD case. |
| 27. | 2012-09-28 | Britton | LASC BC492978 | 2012-09-28 – Legal malpractice suit. |
| 28. | 2014-04-19 | Allen | CD Cal. 2:14-cv-02721 | 2014-04-19 – Mass tort BFD. |
| 29. | 2016-02-22 | Kranich | CD Cal. 2:16-cv-01209 | 2016-02-22 – Civil RICO complaint. |
| 30. | 2016-03-29 | Gruber | LASC BC615458 | 2016-03-29 – Sued for fraud. |
| 31. | 2017-06-17 | Fair | LASC BC665472 | 2017-06-17 – Class action. |
| 32. | 2019-06-26 | Ruigomez | LASC 19STCV22296 | 2019-06-26 – Legal malpractice suit. |
| 33. | 2020-05-26 | Kohan | LASC 30-2020-01143145 | 2020-05-26 - Fraud |

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

| | | **TABLE 1**<br>**GIRARDI (PARTIAL) FRAUD/MALPRACTICE**<br>**CASE INVENTORY** | | |
|---|---|---|---|---|
| **NO.** | **FILE DATE** | **PLAINTIFF CASE NAME** | **CASE NO.** | **COMMENT** |
| 34. | 2020-09-29 | Finn | LASC 20STCV37235 | 2020-09-29 – Sued for fraud. |
| 35. | 2020-10-29 | Selberg | LASC 20STCV41541 | 2020-10-29 – Legal malpractice suit. |
| 36. | 2020-12-09 | Sheldon | LASC 20STCV47160 | 2020-12-09 – Sued for fraud. |

37.     On March 8, 2020, Girardi was forced into involuntary bankruptcy.[38]  A series of fraud lawsuits followed and the firm in this interval collapsed.[39]

38.     A year later, on March 6, 2021, the Los Angeles Times article put many of the pieces together as to how Girardi managed to escape ethical enforcement by OCTC from as early as 2002 to March 2021.[40]

39.     On January 13, 2021, Girardi's brother, Robert, claimed in bankruptcy court that Tom was no longer competent.

40.     On March 9, 2021, the State Bar deactivated Girardi's license, and at the end of the month, charged him with misconduct in the *Selberg* matter.[41]

41.     After several rounds of recusal, Girardi's state bar matter was abated in light of his brother Robert's representation that Tom would never practice law again.[42]

---

[38]   Exhibit 11.
[39]   Exhibits 14-16.
[40]   Exhibit 4
[41]   Exhibit 22.
[42]   Exhibit 27.

### 2.  Implications

42.      As can be readily gleaned, a scandal of this magnitude reflects a profound institutional failure.  It is not possible that so much ethical misconduct – that is, countless felonies each warranting disbarment – could be covered up, or complaints to the Bar could be captured and killed, by a few motivated bad apples within the organization.

43.      Even if not a single complaint had been presented to the Bar, and this is not the case, its failure to detect and prosecute Girardi's *modus operandi* over the course of 30 years based on the public record reflects abject institutional incompetence.

44.      Accordingly, the question of how such extraordinary, high-profile misconduct could have gone on for so long, harming the public to an extent that probably exceeds all of the ethical errors committed by Bar targets *in all of the organization's other cases _combined_*, including enough acts of misconduct to disbar 100 attorneys, cannot be written off as some sort of isolated failure, by a dismissive oops-that-one-got-away type of institutional self-delusion.

45.      The scope and magnitude of the Girardi scandal demands a plenary, thorough and public accounting of the State Bar's charging machinery viewed in the specific context of the scandal to explain how an ethical mass murderer was not caught, all the while the Bar spent its time prosecuting thousands of ethical traffic tickets.

46.      As relevant to this case, it is necessary to understand the dysfunctions in the State Bar system that results in it subjecting misdemeanor solo offenders to years of draining ethics litigation while exempting attorneys in larger organizations including its shocking failure to prosecute the biggest ethical offender in California legal history.

### 3.  The State Bar Downplays the Scandal

47.      On May 8, 2021, Respondent transmitted a detailed CPRA public records request to the Bar querying it for a wide variety of information in relation to Girardi.[43]

48.      On June 3, 2021, other than producing an already-public opinion from the *Dole* case, the Bar declined to reveal any other information or produce a single

---

[43]    Exhibit 28.

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

document.[44]  This is despite acknowledging that it retains the legal prerogative to disclose such information.[45]  It is not the case that privacy or other statutory rights of attorneys preclude the Bar from disclosing information about its internal processes.[46]

49.     On June 10, 2021, the Bar issued a press release about the scandal admitting in substance that 'mistakes were made' but otherwise not disclosing any real information including the underlying audit.

50.     Instead, it proposed to expand its power over attorneys by more heavily scrutinizing trust accounts, a kind of reward for its misconduct, and thereby also enabling it to further burden solo and small-firm attorneys with trivial (aka non-misappropriation-related) trust offenses in its subjective judgment.[47]

51.     Yet, the State Bar is a public agency.  Its refusal to disclose information about the Girardi matter reveals the Bar's intransigence to confronting the reasons, policies and dynamics – some of which may be illegal, others unethical, and still others criminal – that allowed Girardi to commit such a quantum of misconduct with regulatory impunity, to the point where the California Supreme Court has elected to step in.[48]

52.     Indeed, and almost predictably at this point, the Bar's answer to the allegation that its special prosecutor function has been corrupted is to give such prosecutors, including at least one directly involved in the Girardi scandal, a 175% raise.[49]  OCTC may as well give Mark Fuhrman a medal for promoting racial harmony.[50]

---

[44]  Exhibit 29.
[45]  SB Rules of Practice, Rule 2302(a), (c), (d), and (e); *e.g.*, ¶ (d): "…the Chief Trial Counsel … may disclose documents or information concerning a complaint(s) or investigation(s) for the protection of the public when the necessity for disclosing information outweighs the necessity for preserving confidentiality, including … (i) *The maintenance of public confidence in the discipline system's exercise of self-regulation.*
[46]  *Ibid*.
[47]  Exhibit 30.
[48]  *Los Angeles Times v. State Bar of California* (2021) Case No. S269401; *see* Exhibit 31.
[49]  Exhibit 38.
[50]  Exhibit 2.

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

### 4. Relevance of the Scandal to OCTC's Docket.

53.     The Girardi case changes everything, because OCTC must recalibrate its entire philosophy in terms of how it conducts business.  For at least 20 years, it has let the Charles Manson of the legal community roam free to commit not just Sharon Tate's murder, but countless murders, all the while subjecting solos and small-firm attorneys to the full brunt of prosecution for their jaywalking and open-beer-can offenses.

54.     One can hardly capture in words how deeply corrosive the Girardi scandal potentially is, and feels to Bar targets, relative to how OCTC conducts its day-to-day business of charging solo and small-firm lawyers with misdemeanors while exempting powerful attorneys like Girardi from their ethical felonies.

55.     As to this case specifically, the complainant in this matter, Justice Fybel, characterized the asserted offenses in this case as "serious."[51]  A second court later chimed in to characterize this case as "extreme."[52]

56.     Based on its 11-page charging document, it can be safely assumed that OCTC joins the judiciary's severity characterizations, especially in anticipation of any sentencing, and that this serious and extreme case should be procedurally and substantively litigated, and sentenced, with this gravity in mind.

57.     However, if this case is considered by the system to be serious and extreme, what words in the English language fairly capture Girardi's malfeasance?  Are there such words?

58.     After the Girardi scandal, the decision by OCTC to require Plaintiff to spend this much time in litigation, and to subject numerous other attorneys with small-time offenses, over (in this case) a constitutionally-protected rhetorical quip uttered 4-1/2 years ago and counsel's quarrelling with the judiciary in one case about perceived intellectual dishonesty (also constitutionally-protected[53]) is absurd.

---

[51] *LA Times v. State Bar of California*, Case No. S269401 (2021).
[52] *Briganti v. Chow* (2019) 42 Cal.App.5th 504, 512.
[53] *Standing Committee v. Yagman* (9th Cir. 1995) 55 F.3d 1430, 1441.

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

59.     The Girardi scandal contextualizes all current and future State Bar cases. All charging decisions must now be measured against Girardi; all sentencing decisions must be similarly measured.  All prosecution of lawyers for their mistaken or defiant statements in pleadings,[54] or probation violations,[55] failure to pay for a transcript[56], or the failure to more carefully scrape one's internet presence as an attorney while suspended,[57] must be assessed relative to the long string of brazen capital offenses committed by Girardi and not charged by the Bar, under the assumption that such misconduct might be occurring at other big or connected law firms.

60.     But it cannot be known for sure where the core dysfunction lies without public disclosure by the State Bar of all the inside circumstances of this situation.

61.     Every time the State Bar now seeks to suspend an attorney from practice, as it does here, it must grapple with the reality that it did not (timely) charge, much less suspend, Girardi.

62.     Every time the Bar seeks to argue at sentencing how grievous an attorney's misconduct is in order to justify some disruptive or career-ending punishment, it must be measured against the punishment imposed on Girardi.

63.     As a matter of sentencing proportionality principles,[58] the scandal has negated the organization's credibility in its current charging practices.  Virtually every offense charged by OCTC is an infraction relative to Girardi's misconduct, especially combined with the agency's Biblical failure to interrupt that misconduct before Girardi Keese collapsed.

## C.  Selective Prosecution

64.     Girardi is the primary example raising questions about the State Bar's fitness to enforce ethics, but it is hardly the only example of the pervasive felony-caliber

---

[54]   *See, e.g.,* U.S. Supreme Court Case No. 20-1360
[55]   *See, e.g.,* State Bar Case No. SBC19O30624.
[56]   *See, e.g.,* State Bar Case No. SBC21O30475 (Ct. 8).
[57]   *See, e.g.,* State Bar Case 21O06392 (investigation of May 28, 2021)
[58]   *See, e.g.,* Frase, R., "*Punishment Purposes*," 58 Stan. Law Rev. 67, 74-75 (2005).

misconduct committed by attorneys at big or powerful law firms that is minimized, ignored or exempted by the State Bar system.

65.     The problem of State Bar disciplinary authorities being unwilling to regulate ethical misconduct at big law firms, and as such defaulting to pick on only solo and small-firm lawyers, goes back many years.  It was chronicled in a 1998 ABA article.  There, Carol Langford, a former chair of the California State Bar ethics committee commented, "solo and small-firm lawyers are far more likely to face disciplinary actions than lawyers in large firms, where the number of lawyers makes it difficult to pinpoint responsibility for ethical violations.  She also says disciplinary officials are less inclined to spend limited resources pursuing more complicated cases against large firms … only by prosecuting large firm lawyers as well will it be clear that discipline is even-handed."

66.     If a solo or small practitioner attorney committed three instances of forging a court order, he would likely be disbarred in a most gruesome, high profile public display of State Bar shaming.  He would almost undoubtedly be subjected to a public prosecution litigating to formal disbarment, suffer maximum financial costs, fines and other penalties, and then be subjected to the Bar's strongest public broadcast of that outcome, on its website and its other social media platforms.

67.     But in a case where a big firm attorney committed hundreds of ethical offenses and was reported to the Bar, it was quietly removed from the State Bar's public domain, no NDC was filed that publicly detailed the extent of the misconduct, there was no high-profile public disbarment prosecution, no charging of the firms involved with supervisory or other offenses, no known imposition of costs, fines or penalties on the offender, and no easy way for the public to obtain information about this massive bulk of ethical misconduct, all in a singularly shocking display of State Bar big-firm protectionism.[59]

---

[59]   Exhibits 42-83.

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

68.     As a result of the Bar's suppression and general inaction in these matters relative to the high-profile charging activity directed at solos and small-firm practitioners, this has emboldened the firms involved to dispute the misconduct by blaming and defaming the victims, in plain derogation of the State Bar's public service mission.

69.     According to the State Bar, there are 266,000 attorneys in the State of California, with 190,000 holding active licenses to practice law.  The demographics of this 190,000 reflect that 37% work in law firms, 21% are solo practitioners, 13% work in government, 11% work as in-house lawyers, and 15% work in some other capacity.  Within the 37% working in law firms, 58% of these attorneys are in firms of than 10 attorneys and 37% work in firms with more than 50 attorneys.[60]

70.     Thus, if State Bar ethics enforcement were evenly distributed in a pool of 676 random cases reviewed, the breakdown of those cases brought ought to conform to the distribution as reflected in columns 3 and 4.

| TABLE 2 – OCTC CASE BREAKDOWN | | | | |
|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 |
| NO | SETTING | % | EXPECTED NO OF CASES (In Pool of 676) | ACTUAL NUMBER |
| 1 | Solo/Other | 39% | 264 | 655 |
| 2 | Law Firm 2-10 | 15.5% | 105 | 16 |
| 3 | Law Firm 11-50 | 7.7% | 145 | 2 |
| 4 | Law Firm 50+ | 13.7% | 92 | 0 |
| 5 | In-House Lawyers[61] | 11% | 73 | 0 |
| 6 | Government | 13% | 88 | 3 |

---

[60]  *See* Exhibit 10.

[61]  It is difficult to detect which attorneys might work in-house.  There may be some that were charged, but without individually contacting the pool, there is no easy way to make such a determination.

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

71.     Instead, the sample is dramatically skewed toward solos and small law firms.  Indeed, small practitioners (solos, other and ones in firms 2-10) appear to suffer 99.2% of the charges filed by the State Bar, while they only make up 54% of practicing lawyers.  Solo and other (individual) attorneys (excluding firms of 2-10 attorneys) make up just 39% of the profession, while suffering 96% of the charges.

72.     If a lawyer works for the government or at a law firm above 10 attorneys – both of which reflect a certain amount of political and legal might, the odds of being charged by the State Bar is less than 1%.

73.     This disparity in the charging practices of OCTC reflects a dramatic example of its systematic violation of equal protection in the form of selective prosecution.

### D.   Disregard of Constitutional Limitations

74.     OCTC does not seem to analyze the constitutional limitations of its charges before filing suit.  Naturally, it then infringes on those rights.  The organization knows, or must know, that it has a fighting chance of leveraging a target into capitulation by its illegal cost system, one not based on the merits, but based on muscle.  On information and belief, this is why OCTC does not bother with such pre-litigation analysis: there are no consequences if it does not.

### E.   Insufficient Pretrial Procedures.

75.     Rule 5.124 motions to dismiss in State Bar Court are not interpreted to require real legal analysis for charges that are invalid or unconstitutional.  Rather, OCTC dodges the difficult questions with its defective charges in briefing and the Bar Court system then issues content-devoid rulings in the form of one-line "brush-offs," which ends up displaying its contempt for the rule of law, and in this case, its rejection of federal supremacy principles.  The charges in this case were and clearly are subject to dismissal based on the First Amendment.

76.     There are no other rule-based procedures that allow a Bar target to challenge an invalid OCTC filing, and particularly no procedures comparable to a motion

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

for summary judgment, thus effectively subjecting every charged attorney to an illegal Hobson's choice presented by the Bar's trial system, as long as OCTC states a disciplinable offense, which per the discussion above, literally allows it to charge anything.

### F. Refusal to Acknowledge Legitimate Pretrial Challenges

77.     Even when Plaintiff constructed a legitimate MSJ-comparable procedure based on the Bar's own rules and procedures, OCTC and the State Bar Court system simply pretended that this construct was not viable, and it did not address the issue, again reflecting a lack of seriousness about its purpose and a dismissiveness of the rights of targeted attorneys.

### G. Illegal Cost Trap

78.     The Bar's trial system imposes an illegal trap founded in cost notions. Theoretically, the system legislates a two-way cost-shifting system to the victor, but in practicality, it is a lucrative one-way cost shifting system in favor of OCTC because of two dynamics.

79.     First, OCTC does not pass along its actual costs according to traditional standards.  It has instead set up an (illegal) "automatic" cost system based on figures invented pursuant to a schedule.  This schedule putatively covers the cost of "investigators" but this expense is not actual (as investigators cannot possibly incur the kind of costs OCTC later imposes) and it in reality acts as a State Bar cottage industry founded on illegally shifting the labor expense of its administrative employee work force to Bar targets.  California attorneys already pay hefty annual dues to cover the State Bar's discipline function; targeted attorneys are not morally or legally obligated to augment OCTC's salaries by invented cost charges.  It flatly contravenes settled constitutional principles for legal outcomes to be automated.  Moreover, the allocation of this bonus dark money appears in the form of extraordinary, judge-like salaries for some administrative-caliber State Bar employees.

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

80.     Second, since attorneys, and especially the small-firm and solo attorneys that constitute 99% of the Bar's targets, do not normally have an "investigator" work force on staff as does OCTC, Bar targets cannot recover anything near the Bar's invented cost schedule, even if a target were to win the case in its totality and be entitled to costs. Thus, the legislated two-way cost shifting is effectively one-way cost shifting in favor of a government agency and results in a system that is based on muscle instead of merit, as more fully detailed below.

81.     Consequently, the Bar's cost/trial trap imposes on targeted attorneys an illegal Hobson's choice: they must *(i)* either settle regardless of the merits of their defense and be subject to the punishment proposed by the Bar, including the permanent libel of one's professional reputation even if legally unwarranted or *(ii)* they must risk a trial in which the Bar will likely drain the attorney with significant costs and then still almost invariably prevail, since State Bar Court rulings do not meet basic minimum competency as required by federal law, as discussed below.

## H.  Meaningless Court System

82.     The idea of a "kangaroo court" is more than just the sour-grapes griping of defendants frustrated by a legal situation.  It is a legal concept in federal law that represents a federal due process violation if a particular court system is effectively a meaningless pretense.  After 11 court rulings in this case undergirded by serious, detailed legal briefing, not one of them resulted in a competent, accurate or thoughtful ruling according to the standards practiced by rank-and-file state superior court judges.

83.     Plaintiff was basically subjected to 11 one-line "brush-off" rulings (as well as a standard post card denial by the California Supreme Court).  As such, and in conjunction with the flaws discussed above, the State Bar Court system fails to meet minimum constitutional competency requirements as a matter of federal due process to impose the kind of serious, actual punishments that its rules or procedure provide for and that it carries out, in light of the Court system's refusal to address legal issues meaningfully.

# VII.

# THE CHARGES IN STATE BAR COURT

84.    The NDC violates Plaintiffs' First Amendment rights because federal supremacy rules under *Yagman* clearly foreclose the Bar's prosecution.[62]

## A.  Count 1 – Succubistic Adoption of the Defense Position

85.    In particular, in Count 1, Division Three attributed statements made in a 2017 notice of appeal that criticized the OC trial court's judicial ruling as a personal criticism of the ruling's author, a then-state court commissioner:

> The ruling's succub[i]stic adoption of the defense position, and resulting validation of the defendant's pseudohermaphroditic misconduct, prompt one to entertain reverse peristalsis unto its four corners.

86.    The statement was clearly inadvisable as a tactical matter and certainly provocative as a linguistic matter, and only a few people appreciated it as a colorful burn to protest an adverse ruling, but at the end of the day, it is still just a comment about a piece of paper – not the author of it – and paper cannot be sexualized.

87.    Comments about a piece of paper also cannot be imputed to describe the author, for those who take reading the English language seriously.

88.    It is the State Bar's unwillingness to read the language carefully – and as required by the English language – to reach a conclusion that the comment was a personal attack on the OC Commissioner's (sexual) character, and as such that it "manifested gender bias."

89.    Even if the language could be read to constitute an *ad hominem* attack – it cannot – the remark in question would have unquestionably constituted rhetorical hyperbole, indeed, perhaps one of the most rhetorically hyperbolic statements in published legal history, and was therefore easily protected under *Yagman*.

90.    Detail for this position was set forth in multiple appellate briefs filed in State Bar Court, one of which is included here.[63]  In not one ruling of ten did the State

---

[62]   *Standing Committee v. Yagman,* 55 F.3d 1430, 1438-1440 (9th Cir. 1995).

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

Bar Court address any of the many detailed legal arguments supporting the two basic observations above.

91.     Instead, the State Bar went on to accuse counsel of an entire array of gender related wrongs, by ridiculously claiming that the language implied that the OC trial judge was "overly aggressive," "predatory," a "hyperaggressive female demon attempting to engage in carnal intercourse with men," and that counsel had engaged the "insidious tactic of attacking the judicial officer's competence based upon harmful and derogatory stereotypes."

92.     However, even if the language as written conveyed the sentiment that a judge was a, like or had properties of a succubus – it didn't, since sexualized nouns that are employed as adjectives lose their sexuality according to elementary reading principles (think: insatiable female versus insatiable appetite) – such colorful analogies to mythical creatures would clearly qualify as rhetorical hyperbole.

93.     Notably, such terms have been equally invoked by feminists including by a New York Times journalist named Susan Faludi in 2016.  In that article, Faludi analogized to a female-male political problem as a "two-headed Cerberus," which is a mythical (male-looking) dog.

94.     In particular, Faludi used the term this way:

> Understanding [Secretary Hillary Clinton's] demonization requires admitting her full significance in our political history, for she is not simply a pioneering woman fighting an Ur-misogyny. Mrs. Clinton faces a two-headed Cerberus, an artificial conjoining that occurred in the early 1990s, of wounded Republican invincibility and wounded male prerogative. Our current political crisis won't be resolved until those forces are separated and the Cerberus slain. [Underscore added].

---

63   Exhibit 33.

95.     Faludi's language is just as theoretically objectionable as counsel's language, using the interpretative tools adopted by the State Bar.  However, when such an analogy was offered by a *feminist NYT journalist*, no one got offended.

96.     More importantly, the State Bar's interpretation is simply wrong.  Faludi employed the mythical reference figuratively not literally, and so did counsel, and it is a strikingly obtuse approach to reading the English language to equate an adjective as having the same meaning as its noun form, to treat a mythical invocation of that misread adjective as a literal description, and to then dream up bogus gender-related offenses associated with that inaccurate literal interpretation.

97.     The idea that this kind of criticism of a judicial ruling was in in truth a "carnal" appeal to "hyperaggressive female sexuality" is preposterous.  OCTC's entire interpretive construct is little better than Kee McFarlane-McMartinesque magical thinking, another prototypical dose of the undisciplined psychology that has infected our national discourse with countless absurdities.[64]

98.     Consequently, the judge's interpretation of the language in the published *Martinez* opinion was, respectfully, wrong; the State Bar's interpretation took his incorrect interpretation to an absurd next level; the referral for ethical prosecution technically constituted a First Amendment federal tort[65]; and the State Bar Court's refusal to address any of this with any thoughtfulness, much less adjudicate the matter correctly, after 10 motions is part of Plaintiff's proof that it is a meaningless court system in violation of federal due process.

### B.  Count Two – Thwarting Appellate Review

99.     OCTC also initiated charges for other non-crimes.  It alleged that Plaintiff improperly criticized the trial judge as attempting, apparently, to thwart appellate review because the judge did not serve the signed OC judgment.  There is no factual dispute that

---

[64]   *See, e.g.*, Stephens, Bret, "*Woke Me Up When It's Over*," New York Times (Feb. 23, 2021

[65]   *Hartman v. Moore* (2006) 547 U.S. 250, 256, 262; *Nieves v. Bartlett* (2019) – U.S. –, 139 S.Ct. 1715, 2019 U.S. Lexis 3557, *9-10 (Case No. 17-1174, March 28, 2019).

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

a judgment was presented to her, that she signed it, and then it was not served on the parties.

100.     Plaintiff drew the inference based on these facts, as they appeared to counsel, that she did not serve the judgment because this was a way to secretly expire Martinez's appellate rights, as was her right, without Plaintiff knowing the clock had started.  The judge's office has subsequently taken the position that it did not serve the judgment as some sort of mistake by a combination of clerks involved in service of the court's orders.

101.     The State Bar infers and alleges that this was a false attack on the judge's character.  However, Plaintiff disclaimed his perception with the term "apparently" (aka how it appeared to Plaintiff) which makes the statement by definition true and therefore plainly not actionable under the First Amendment.

102.     OCTC proposes to effectively criminalize the terminology thousands of lawyers employ every day to disclaim certainty about an event when they use the word "apparently" to describe what they see, including numerous instances in which the State Bar trial judge herself routinely used the term "apparently" to disclaim factual theories in a 2007 case when she was a practicing lawyer.

103.     These arguments were formally raised in multiple motions in State Bar Court, as exemplified by one of the filings, incorporated herein. [66]

104.     Regardless, lawyers cannot be ethically sanctioned because they choose one inference over another to describe an action of a third party including the action of a judge; lawyers are as a matter of First Amendment advocacy and freedom of thought and speech, entitled to choose any of the reasonable inferences from the evidence of an event, as they believe most conforms to the truth, and the inference that the judge sought to thwart appellate review was one of several reasonable interpretations.

105.     Furthermore, the entire idea of the statement in question being a "false" statement, a "false" opinion or any other sort of fraudulent act stretches, and breaks,

---

[66]   Exhibit 34.

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

reasonable boundaries for the entire concept of falsity, if false statements are even impermissible under controlling U.S. Supreme Court precedent.[67]  Regardless, Plaintiff did not state as a fact that the trial judge did anything; he stated that this is how the situation appeared to him because the judgment was not served in contravention of ordinary legal practice.

106.     Finally, thwarting appellate review is not a corruption-related crime under *Yagman*.  A judge can legally thwart review by not serving the judgment; therefore, the entire idea that such an allegation "disrespects" a judge is a non-starter.  Because Plaintiff accused the judge of something she was legally permitted to do, this is the analytical equivalent of accusing a judge of, for example, being impolite.

107.     Even if the accusation is false – let's say the judge was objectively polite – the accusation does not rise to the level of a 6068(b) offense because such offenses have been strictly interpreted by federal law.  In other words, to be "disrespectful," an attorney must accuse of judge of considerably more than merely doing something she has a legal right to do.  Under *Yagman*, it must baselessly accuse the judge of a crime involving moral turpitude.

108.     Yet, Plaintiff has been subjected to protracted and expensive legal proceedings for over a year attempting to establish the self-evident outcome that the Count Two charge is invalid.

## C.  Counts Three and Four - Intellectual Dishonesty

109.     In the State Bar's NDC Counts 3 and 4, the State Bar further alleges that Plaintiff made various statements arguments in two appellate briefs in the same *Martinez* case and that these also constitute "disrespect" of the OC trial court.

110.     The statements in the two briefs variously allege that the Commissioner deviated from the law so clearly and consistently throughout her opinion that the ruling was not in fact a detached legal analysis by an independent jurist but represented an

---

[67]  *United States v. Alvarez*, 567 U.S. 709, 717-720 (2012).

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

1  intentional decision to deviate from the law, in service to some other master.  In other

2  words, Plaintiff accused the judge of intellectual dishonesty.

3       111.    The Bar has defaulted when it comes to actually debating the specific

4  criticisms Martinez levied about the fee ruling in issue:

> (1) Plaintiff sought attorney's fees for a legal effort.  As against the idea that *Chavez v. Los Angeles* barred the request, the request did not fall under its "grossly inflated" exception because the $140K request was simply not an unusual or excessive number for a four-year case to run the length of the superior court system, a figure that was dramatically lower than the ***$870K*** fee request that the *Chavez* "grossly inflated" construct is founded on.[68]  In other words, it was mathematically dishonest for the OC trial judge to view a $140K fee request as one that was "as excessive" as an $870K request, for a similar outcome.

> (2) The case did not qualify for treatment under *Chavez's* exception to the normal rule of awarding fees in these cases for ones that should have been filed in limited civil, because that was impermissible given Martinez's decision, and right, to pursue injunctive causes of action.[69]

> (3) that a case that is successful on a limited basis (here, resulting in termination of a fraudulent enterprise, a small but full recovery on a wage claim, and a small recovery on a FEHA claim) cannot accurately be classified as litigation that is "spectacularly unsuccessful" as the OC trial court described it, and in addition, this is a construct that only applies to FEHA claims (as opposed to Labor Code wage claims), where fees can be denied under FEHA 12965(b)'s discretion per *Chavez*.[70]

> (4) that the trial court's accusations that counsel invented or exaggerated 15-hour and 25-hour billing entries, and therefore must have inflated the rest of the bill, was arrestingly inaccurate, as effort for the two controverted entries was supported by

---

[68]  *See Chavez v. Los Angeles* (2007) 47 Cal.4th 970, 975.

[69]  *See* Code Civ. Proc., § 86, subds. (a)(7), (a)(8).

[70]  *See* Gov. Code, § 12965(b) and *Chavez*.

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

detailed opposition filings and easily supported the hours claimed.[71]

(5) that the trial court's finding under *Ling* that wait-time penalties are not wages was plainly inaccurate given the language of Labor Code section 203, an error the appellate court capitulated to.[72]

(6) that the trial court's finding that Martinez was not the prevailing party because O'Hara capitulated to pay the outstanding wage balance at trial is inaccurate, as also capitulated to by the Orange County appellate court.

112.    Consequently, the State Bar never had grounds to fault counsel for claiming that the Commissioner ruled against him in intentional derogation of the law, because it is functionally impossible for such an error-laden ruling to occur without a judge *not engaging* in intellectual dishonesty.

113.    Most obviously, the very idea that a sitting judge does not understand that a lawyer must file any case with an injunctive cause of action in unlimited civil, for example, is itself impossible to accept.  Any and every experienced lawyer, much less every California superior court judge, knows – even first year law students know – that you cannot file injunctive causes of action in limited civil.

114.    For the OC trial judge to have denied fees on the basis that the action was not filed in limited civil, when that was impermissible, is facially dishonest.

115.    To equate a fee request of $140K with one seeking $870K is mathematically dishonest.

116.    Even if counsel were wrong as to some or all of the above disputes in the Commissioner's fee ruling, the facts supporting counsel's position were elaborately set forth, and corroborated, in the appellate briefs and therefore this is a clear example of the

---

[71]  As argued in the state court appellate briefing: "if the Court actually drills down to the legal work underlying the allegedly unreliable billing entries that form the basis of the trial court's and O'Hara's larger accusation that the billing was inflated [record citations], their theory falls apart."

[72]  *See Ling v. P.F. Chang's* (2016) 245 Cal.App.4th 1242.

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

statements constituting protected First Amendment speech since the factual basis for them was disclosed,[73] as set forth in briefs filed in a third and fourth appellate petition in State Bar Court, incorporated herein.[74]

## VIII.

## FIRST CLAIM FOR RELIEF

### THE STATE BAR SYSTEM SUFFERS FROM SERIOUS CONSTITUTIONAL DEFECTS THAT VIOLATE ATTORNEYS' FEDERAL CONSTITUTIONAL RIGHT TO DUE PROCESS

117.     Plaintiff incorporates paragraphs 1-116, as if fully set forth into this cause of action.

118.     As outlined above, the State Bar system suffers from serious constitutional defects.  These include:

(1)   unremedied, palpable corruption;

(2)   meaningless charging standards;

(3)   selective prosecution against solo and small-firm attorneys;

(4)   disregard of constitutional limitations in charging;

(5)   insufficient pretrial procedures to eliminate meritless cases;

(6)   refusal to respect procedures that must be legally available to permit pretrial challenges.;

(7)   illegal cost trap based on unconstitutional, illegal, and fictional automated outcomes;

(8)   refusal to issue competent rulings within the meaning of the Code of Judicial Conduct for judicial competency, Canon 3;

---

[73]   *Standing Committee v. Yagman* (9th Cir. 1995) 55 F.3d 1430, 1438, *citing Milkovich v. Lorain* (1990) 497 U.S. 1, 19; *Lewis v. Time* (9th Cir. 1983) 710 F.2d 549, 555; Restatement (Second) of Torts (1977), § 566 (statement of opinion actionable "only if it implies the allegation of *undisclosed* defamatory facts as the basis for the opinion").

[74]   Exhibits 35, 36.

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

119.     These defects are not casual, manageable, trivial or in any way something a court should overlook in deciding whether a lawyer should be subjected to this system, without first correcting them.

**A. Corruption**.

120.     Even minor corruption potentially shows up in unexpected places in a legal system.  If a DA's office were mired in corruption allegations, the usual response is to temporarily remove the function to an agency without such baggage, such as to the Attorney General's office.

121.     Before Bar targets are subjected to such a system, the extensive corruption allegations associated with the Girardi scandal should be investigated, thoroughly understood, comprehensively rooted out, and then reformed with checks and balances in place to guard against the dynamics that caused it and that may still exist.  In the interim, ethics problems should be referred to another agency, or in the alternative, all OCTC cases should be abated.

122.     It is self-evidently a violation of a system's targets to subject it to a corrupt prosecuting agency.

**B. Meaningless Standards**.

123.     As explained above, the standard of "due respect" is overbroad, vague, and most importantly, is enforced differently at the state level than the limitations that are imposed by the federal judiciary.  In this case, the State Bar system has simply ignored federal law – a direct challenge to this Court's authority flowing from the U.S. Constitution entitling it to dictate the First Amendment constitutional limitations that all states must abide by in penalizing speech.

124.     Separate from this, standards that allow OCTC to charge attorneys with effectively anything that subjectively bothers it means that legally the system does not establish anything of value for the public.  The public needs to be protected from unethical lawyers, but not from charges that OCTC invents for various reasons that have

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

nothing to do with public protection and seem at times to serve the agenda of private interest groups.

### C.  Selective Prosecution.

125.    Suffice to say, a system that targets 99% one group, on no particular evidence that this group is actually more ethical or unethical than other groups (rather, solos and small-firm attorneys are easier targets, the "low-hanging fruit" for OCTC), establishes a dramatic example of constitutionally-impermissible selective prosecution.

126.    Such selective prosecution undermines the State Bar's public service mission, by marking solos and small-firm attorneys as unethical while exempting big firm attorneys from such inconveniences in a skewed system that ends up making both designations untruthful and therefore counterproductive as a resource for the public to assess the ethical competency of attorneys.

127.    Furthermore, by mostly charging attorneys with misdemeanors, and thereby exempting big firms from their major ethical offenses, the State Bar profoundly fails to actually protect the public from the risk of the more significant unethical problems.

### D.  Disregard for Constitutional Limitations.

128.    There is no evidence from this case that OCTC is or was deterred by First Amendment or other legal limitations that should have constrained its charging decisions. In this regard, their own charging decisions may be illegal, and by reference to its own standards, a practice of filing cases that violate any law means that OCTC is systematically behaving in a manner that it itself defines as unethical and therefore illegal.

### E.  Insufficient Pretrial Procedures.

129.    The procedures to challenge a Bar case prior to trial are too weak in light of the serious, permanent consequences that the Bar imposes on attorneys through its public reporting.  Although there is technically a procedure, it is considerably less useful than other systems (requiring OCTC to only state language that constitutes an ethics

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

offense, which as above, can be anything it designates as unjust, *etc*.), compared to a 12(b)(6) in federal court or a demurrer in state court that require facts that meet an applicable standard.

130.    Meanwhile, the consequences of being subjected to a meritless case, one that cannot be weeded out without the burden, delay, risk and expense of trial, are substantial – and far exceed the putative ethical policing that supposedly benefits the public in all but the most egregious cases.

131.    In this case, an extensive demurrer-type motion was filed to challenge all of four charges in the NDC, but because Rule 5.124 was not interpreted to require NDCs to possess a comparable level of legally accurate and factual pleading, and resulted in a meaningless ruling upon challenge, there is no effective rule-based procedure to promptly dispose of invalid cases.

**F.  Refusal to Respect Legitimate Pretrial Procedures**.

132.    In State Bar Court, Plaintiff constructed a procedure based on this forum's own rules and procedures that allowed counsel to challenge a case, with evidence, before trial, as elaborately set forth in a motion filed for that purpose.[75]

133.    In a different case, still pending, the State Bar sued an attorney by arguing that:

> In addition to duties to clients, California lawyers have obligations to the courts before which we practice; *to the system of justice itself*; and to the Constitution that establishes that judicial system … The State Bar charges Respondent with abusing the unique power and privilege he enjoys as a lawyer to deprive another person – by his email admissions, several – *of their constitutional right of access to courts and the system of justice*.[76]

134.    The Bar's citation for this obligation to not deprive *others* – the reference not being to clients but strangely to opponents – of their constitutional rights is section

---

[75]   Exhibit 36.
[76]   Exhibit 39:3.

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

6068(a): every lawyer's obligation to "support the Constitution and laws of the United States and of this state."[77]

135.    As such, as OCTC practices it, any action by any lawyer, including prosecutors at OCTC, that can be plausibly viewed as failing to *(i)* support the U.S. Constitution, *(ii)* support the laws of the United States, or *(iii)* support the laws of the State of California states an ethics offense, according to the Bar's own standards.

136.    Unlike Rule 5.124 motions to dismiss, which are limited to the face of the charging document and preclude the introduction of evidence, an ethics violation committed by a party, including OCTC, can be raised as a common law motion at any stage of a proceeding,[78] given the universal rule that all California attorneys must abide by, and may enforce, the ethics rules no matter the legal forum.[79]

137.    Thus, unlike a facial challenge under Rule 5.124(C), a motion to dismiss based on ethics is permissibly based on a different universe of acceptable documentation, involves a different standard, and includes the right to submit evidence, as a common law motion to enforce the State Bar Court's inherent authority to police ethical transgressions.[80]

---

[77]    Exhibit 40:3.

[78]    *In re Missud* (2014) 2014 Calif. Op. Lex. 28, *2; *Martinez v. O'Hara* (2019) 32 Cal.App.5th 853, 855 [announcing ethics violation during disposition of appeal in 2019, based on notice of appeal filed in 2017].

[79]    *People v. SpeeDee Oil* (1999) 20 Cal.4th 1135, 1145, *citing* Code Civ. Proc., § 128.5, subd. (a)(5) [enforcing right to enforce ethical conflicts of interest through inherent power of court to control proceedings]; *Changsha v. Xufeng* (2020) 57 Cal.App.5th 1, 7 [enforcing right to find that anti-SLAPP motion frivolous]; *In re Lapin* (1993) 1993 Calif. Op. Lex. 81, *49 ["Judges in State Bar proceedings have similar inherent authority to exercise reasonable control over the proceedings in front of them"].

[80]    *Stanley v. St. Paul* (D. Id. 2011) 773 F.Supp.2d 926, 927 ["The Court must dismiss a complaint or any portion thereof that states a frivolous or malicious claim, that fails to state a claim upon which relief may be granted, or that seeks monetary relief from a defendant who is immune from such relief."]; *see Levy v. AT&T* (2017) 2017 U.S. Dist. Lex. 29939, *7, Exhibit A [referring to two earlier cases brought by plaintiff that were dismissed as frivolous]; *Standlee v. United States* (9th Cir. 1992) 1992

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

138.     Secondarily, the State Bar Court surely possesses the usual legal right to carry out the logical remedy for the filing of an unethical document or pursuit of an unethical course of action: dismissal.[81]

139.     However, the State Bar system refuses to recognize this as an acceptable procedure, although the proposal abides by all rules and laws of the system.  In eight motions, the State Bar system refused to address the argument.  This warrants recognition of the argument by this Court as a permissible and proper way to challenge an OCTC case prior to trial, as a matter of federal due process.

140.     Federal due process entitles both sides of state case to equally avail themselves of the applicable rules in a given legal system; a state administrative agency cannot, consistent with federal due process, simply pretend that certain rules and motion procedures do not exist, or worse, refuse to even acknowledge that the argument for the existence of such a procedure has been made.

**G.  Illegal Cost Trap**.

141.     OCTC's system of automated, invented cost impositions violates the federal constitution's due process clause, which requires an individualized determination of legal findings.

**1.  Constitutional Invalidity of the Statute and Rule**

142.     In its NDC, OCTC seeks compensation pursuant to B&P 6086.10 in the amount of $6,464.  This figure derives from the State Bar's cost schedule, one that outlines the presumptive payment amount for matters at various stages of litigation including here where no trial has commenced.[82]

143.     The governing statute's main provision, section 6086.10(b)(3), states that "The costs required to be imposed pursuant to this section include all of the following …

---

U.S.App.Lex. 7360, *2-3 ["The district court properly dismissed Standlee's FTCA claim as frivolous."].

[81] *In re Lapin* (1993) 1993 Calif. Op. Lex. 81, *49; *Slesinger v. Walt Disney* (2007) 155 Cal.App.4th 736, 758-759.

[82] Exhibit 17 [Cost Schedule]

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

[t]he charges determined *by the State Bar* to be 'reasonable costs' of investigation, hearing, and review."

144.     There are fatal constitutional problems with this statute – and the even more draconian 5.130 rule that incredibly proposes to prohibit attorneys from challenging section (b)(3), a deeply problematic supposition as against the most rudimentary constitutional limitations.[83]

145.     Based on various principles, including separation of powers and due process, a party to a legal dispute does not get to subjectively and unilaterally decide what is reasonable.  As explained in paraphrased language by *Miller v. Ghirardelli*,[84] in talking about California law:

> Under California law, duly enacted statutes are presumed constitutional.[85] Unconstitutionality must be clearly shown, and doubts will be resolved in favor of its validity.[86]  If a statute can be construed in multiple ways, the court will adopt a construction that supports its constitutionality, even if another construction is equally reasonable.[87]
>
> An unconstitutional delegation of authority occurs only when a legislative body (1) leaves the resolution of fundamental policy issues to others or (2) fails to provide adequate direction for the implementation of that policy.[88]  *Such a delegation occurs when the public entity has committed a "'total abdication of that [legislative]*

---

[83]   State Bar Rules of Practice, Rule 5.130(A) ["Under Business and Professions Code § 6086.10(b), an attorney may challenge the propriety of including items in the certificate of costs or the calculation of properly included costs. *But the attorney may not challenge the State Bar's determination of "reasonable costs" under Business and Professions Code § 6086.10(b)(3).*"]

[84]   *Miller v. Ghirardelli* (N.D. Cal. 2013) 2013 U.S. Dist. Lex. 49733 [Case No. C 12-04936 LB, April 5, 2013].

[85]   *Lockyer v. San Francisco* (2004) 33 Cal.4th 1055, 1086.

[86]   *Ibid*.

[87]   *People v. Broderick Boys* (2007) 149 Cal.App.4th 1506, 1522.

[88]   *Carson Mobilehome v. Carson City* (1983) 35 Cal.3d 184, 190.

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

*power, through failure either to render basic policy decisions or to assure that they are implemented as made*… .'"[89]

146.     Clearly, prosecution and adjudication of attorney disciplinary matters are technically handed under one umbrella, the California Supreme Court (thus, the judiciary), thereby foreclosing a traditional separation of powers challenge as between the three branches.

147.     Nonetheless, the Supreme Court recognizes the different roles played by OCTC and the State Bar Court, and it expects each body to stay in its lane.[90]  Awarding OCTC the power to seek costs and to simultaneously announce what it subjectively determines is "reasonable," based on a system that does not track actual costs, contravenes these principles.

148.     In addition, on a more traditional due process basis, every legal determination requires it to be performed by a neutral and detached arbiter; clearly OCTC is not such an entity in deciding what costs are reasonable.[91]

### 2.  Summary Imposition of Costs is Illegal.

149.     Although *In re Respondent J*[92] validated the Bar's basic right to engage in its automated, schedule-based cost system, it also expressly reserved the right of litigants to challenge costs in almost any way that is plausible under the circumstances.[93]

---

[89]  *People ex rel. Lockyer v. Sun Pacific Farming* (2000) 77 Cal.App.4th 619, 634 [emphasis added].

[90]  *In the Matter of Respondent U* (1995) 1995 Calif. Op. Lex. 13, 48 ["Even then, the Supreme Court noted that no one entity within the State Bar was vested with more than one function. (*Kelly v. State Bar* [1988] 45 Cal.3d 649, 655, fn. 8). In contrast, the new State Bar Court operates substantially as an independent entity, consistent with its adjudicative function over matters in which the State Bar is a party. (*Cf. Civil Service Com. v. Superior Court* (1984) 163 Cal.App.3d 70, 77-78."].)

[91]  *Concrete Pipe v. Construction Laborers* (1993) 508 U.S. 602, 617, citing *Ward v. Village of Monroeville* (1972) 409 U.S. 57, 61-62.

[92]  *In the Matter of Respondent J* (1993) 2 Cal. State Bar Ct. Rptr. 273, 1993 Calif. Op. Lex. 82.

[93]  *In re J, supra,* 1993 Calif. Op. Lex. 82, *9-11.

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

150.     Accordingly, Respondent challenges *In re J*, what is now a 28-year-old case, given major reduction in the costs of modern litigation.  Moreover, the idea that OCTC cannot keep track of its actual costs defies the very obligation that is imposed on the rest of the profession.

151.     Furthermore, it is simply untrue.   Lawyers in civil litigation either track their costs meticulously or risk not getting paid for them; is the Review Department in *In re J* actually suggesting that OCTC is incapable of living up to the standards that thousands of regular civil lawyers successfully abide by every day in responsibly practicing law?  Or can this be yet another example where rules passed in the State Bar system that obfuscate OCTC's operation have enabled it to gravitate toward self-dealing?  Could there by anything more unAmerican – and facially invalid – than a rule that says an attorney proposed to be hit with thousands of dollars in dubious "investigator costs" cannot even challenge it?

152.     Costs in regular civil must be found by a neutral party to be reasonable and necessary.[94]  By definition, they must be actually incurred.[95]   They must be claimed via a verified memorandum,[96] and upon challenge, they must be supported by competent, admissible evidence by such things as bills, invoices, or statements.[97]

153.     In contrast, costs in the State Bar forum, where the resisting party has *fewer* due process protections (due to limitations on discovery) and yet still faces significant cost exposure, assessed pursuant to a dubious black box schedule, one which has no disclosed connection to actual costs, is a patently insufficient protection against abuse relative to other cost-shifting schemes, in violation of substantive and procedural due process.[98]

---

[94]   *Nelson v. Anderson* (1999) 72 Cal.App.4th 111, 132.
[95]   *Code Civ. Proc.,* § 1033.5.
[96]   *Jones v. Dumrichob* (1998) 63 Cal.App.4th 1258, 1267.
[97]   *Jones v. Dumrichob* (1998) 63 Cal.App.4th 1258, 1267, *citing Bach v. County of Butte* (1989) 215 Cal.App.3d 294, 308.
[98]   *See People v. Rodriguez* (1998) 66 Cal.App.4th 157, 175.

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

154.     Legislation and/or government practice must meet basic due process requirements; this translates to various iterations and rules specifying the idea of fairness in a given context.[99]  One of these hallmark features of due process is that systems are expected to be fair to persons *in an individualized manner*.[100]

155.     In all other known contexts, the idea of imposing generalized, invented charges on the other party would be scoffed at with citation to the axiomatic and ordinary rule that costs must be both reasonable in amount and reasonably necessary to the conduct of the litigation, which obviously presupposes that they were *actually* incurred.[101]

---

[99]  *People v. Hanson* (2000) 23 Cal.4th 355, 366-367.

[100]  *Wolff v. McDonnell* (1974) 418 U.S. 539, 558 ["The touchstone of due process is *protection of the individual* against arbitrary action of government"]; *Demore v. Kim* (2003) 538 U.S. 510, 551 [""Due process calls for *an individual determination*" before rights are taken away]; *People v. Peoples* (2016) 62 Cal.4th 718, 741, 747, 759, 768, 774 [repeatedly memorializing basic due process contention that defendant entitled to reliable *and individual determination* of his rights]; *United States v. Grant* (C.D. Cal. 2007) 524 F.Supp.2d 1204, 1214-1215 ["The right to substantive due process protects *individual* liberty against certain government actions regardless of the fairness of the procedures used to implement them"]; *People v. Hernandez* (1984) 160 Cal.App.3d 725, 747-748;  Karst, Supreme Court, 1976 Term –Foreword: Equal Citizenship Under the Fourteenth Amendment (1977) 91 Harv. L. Rev. 1, 5-11 [there is an "important due process interest in recognizing the dignity and worth *of the individual* by treating him as an equal, fully participating and responsible member of society"]; *In re C.P.* (2020) 47 Cal.App.5th 17, 30, fn. 8.

[101]  Code Civ. Proc., § 1033.5, subd. (c)(2), (c)(3); *Ladas v. California* (1993) 19 Cal.App.4th 761, 774; *see Ransom v. FIA Card Services* (2011) 562 U.S. 61, 70-71 [deduction for [11 U.S.C. § 1325(b)(3)] expenses by bankrupt debtor must have been actually and reasonably expended]; *Exxon v. Hunt* (1986) 475 U.S. 355, 359 [in environmental context under 42 U.S.C. § 9611(a), "the President shall not pay for any administrative costs or expenses out of the Fund unless such costs and expenses are reasonably necessary for and incidental to the implementation of this subchapter."]; *Lehnert v. Ferris Faculty* (1991) 500 U.S. 507, 560 (Diss. Opn. Marshall, J.) [members of a union would be entitled to object to charges that were not reasonably necessary to union business; by definition, any such charges must have at a minimum been actually incurred].

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

156.     The State Bar's cost-schedule scheme violates all three rules.  Cost orders imposed on Bar targets are not actually incurred.  By definition, they are not actually incurred in the amount claimed.  Furthermore, costs need not be reasonable in amount, as every situation in which OCTC claims costs it did not actually incur is by definition as example where the amount was not reasonable to that individual.  Finally, there is no requirement that costs imposed were reasonably necessary to the conduct of the litigation, which again is defeated in every instance in which OCTC passes a cost bill that does not represent costs it actually incurred.

157.     Some of these outcomes are clearly unacceptable.  The idea that a two-day (Zoom) trial costs over $19,000 in costs is implausible; the idea that it costs over $23,000 for a case proceeding to appeal also presents a serious risk of illegal profiteering in derogation of the due process rights of targets to avoid having their money confiscated and forfeited by a government agency.

158.     Furthermore, the State Bar system generally requires issues against applicants to be proven by the clear-and-convincing evidentiary standard.[102]  OCTC's cost-schedule system not only fails to satisfy a clear-and-convincing standard that reasonable costs have been incurred, it fails to satisfy any standard.  Its automated chart is not evidence of its costs; it is a request for them by a graduated scale.  OCTC is illegally collecting costs it has never proven to the satisfaction of its own requisite evidentiary standards.

159.     Rule 5.130(A)'s removal of the right to challenge the State Bar's cost schedule represents a flagrant violation of due process.  "For government to dispose of a person's significant interests without offering him a chance to be heard is to risk treating him as a nonperson, an object, rather than a respected participating citizen."[103]

160.     OCTC has argued that under B&P 6068.10(d), a reciprocal, "reasonable" calculation applies if the situation is reversed, if Respondent should prevail at trial.  But

---

[102]  *In re Matter of Applicant A* (1995) 3 Cal. State Bar Ct. Rptr. 318, 1995 Calif. Op. Lex. 1, *18-21.
[103]  *People v. Ramirez* (1979) 25 Cal.3d 260, 267-268.

this merely illustrates its constitutional infirmity: if OCTC prevails, it collects, as an interested party institutionally incentivized to *maximize* that figure, what it subjectively declares to be reasonable; but if it loses, it pays, now as an interested party institutionally incentivized to *minimize* that figure, what it subjectively declares to be reasonable.

161.    Thus, the statutory scheme is analytically indistinguishable from a certain kind of coin flip: 'heads I win, tails you lose.'  In both situations, as a party to litigation incentivized for it to turn out a certain way, it can subjectively declare the outcome of 6086.10(b)(3) costs as its own interests suit it.

162.    Moreover, 99% of OCTC's cases appear to involve solo and small-firm attorneys.  It is draconian to say the least for cost recovery provisions to be equated as fair between the parties, when OCTC maintains a 180-man dedicated investigator labor force, while solos and small-firm attorneys are almost certain not to possess such an exotic kind of employee on staff.

163.    Considering the corruption allegations of the Girardi scandal (addressed above), this is clearly not a forum where the subject government agency can be trusted. The idea that the party resisting costs never gets to see what these significant figures are actually composed of, nor possesses any of the traditional tools to resist them, nor is "permitted" to challenge certain of them, is utterly unacceptable on the most basic due process and fairness metrics.

### 3.    Challenge to Reasonableness of OCTC Cost Schedule

164.    In contrast to its $6,400 claim in this case, when *In re J* was published in 1993, there was a daily cost of ongoing litigation: printing, copying, mailing, and in most cases, utilization of couriers.  Today, including in the State Bar's system, virtually all functions are electronic.  They are virtually costless.

165.    There should be no investigation costs at all for a trial.  The investigation should have ended when the NDC was filed.   There are no heavy trial notebooks to copy for all parties; no complicated video system to set up for a live trial; no furious preparation of demonstrative posters – if these even qualify as expenses by investigators.

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

Yet, Respondent has no reason to believe that OCTC has factored in a downward adjustment for the significant reductions in costs enabled by modern technology.

166.     In the instant case, the sum total of the known work product by OCTC, as per a review of the discovery turned over, reflects two items:

(1) 2019-07-12 – two-page letter from Investigator Tran (estimate: 0.7 hrs)
(2) 2020-02-10 – two-page investigator report (estimate: 2.3 hrs)

167.     At a reasonable rate of $50/hr for this caliber of work, actual investigator costs should be about $150.  The fact that the Bar seeks to charge Respondent 40x that, especially multiplied over OCTC's docket of perhaps 500 cases, provides one a baseline paradigm to process the magnitude of the profiteering that is or may be occurring.

168.     OCTC never produced evidence to actually support its $6,400 cost figure in this case, or to support the idea that it requires $10,000/day in costs to try a State Bar case.

### 4.  Challenge to Investigator Costs

169.     State Bar Investigators are overpaid.  There are young (merely college educated) graduates making over $100,000 while similarly-situated government attorneys saddled with years of extra education and the associated debt that comes with it, do not earn nearly this much.  In 2019 alone, Chin Eronobi ($142,343), Braulio Munoz ($138,220), Ben Charny ($129,570) and Sandra Hernandez ($128,639) are examples of the inflated salaries being paid to government bureaucrats who are effectively equivalent to an administrative assistant, while salaries of less than $100,000 are not uncommon among district attorneys and other sophisticated government employees.

170.     Indeed, there are a large number of California *judges* – with all of the burden, scrutiny, qualification, education and experience to win that appointment – that earn less than $200,000 per year.  The idea that OCTC is passing these inflated investigator expenses on to targeted attorneys to benefit its employees, ones who act as little more than data processors, and who are not remotely qualified as compared to the skill, talent, years of investment necessary to act as a California judge – represents

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

1   another defect in the system, all the more in an environment that supposedly precludes

2   any right to challenge.

### 5.   Inability to Minimize Cost Exposure

171.     In *In re J,* the targeted attorney complained that costs in his case should be lower than the schedule because he made a special effort to resolve the matter early.[104] Respondent offers a different but comparable argument.

172.     Respondent filed a detailed motion to dismiss, fully-briefed by October 6, 2020; then filed a comprehensive writ fully briefed by January 29, 2021, and finally, filed a comparably extensive petition for review fully briefed by April 16, 2021.

173.     Not once did any of these courts address or analyze the merits.  It is unfair, and another violation of due process, that Respondent should be subjected to a cost assessment on a schedule premised on the advanced progression of a case when the State Bar Court system does not rule on fully-and-thoughtfully briefed motions, so as to reduce or eliminate the case, and all associated costs, at an earlier stage and consequently minimize the cost exposure of the targeted attorney.

174.     In summary, B&P 6086.10(b)(3) illegally presupposes that OCTC sets the reasonable costs of a prosecution; it does not initially corroborate or verify its costs; even after a dispute, it does not produce evidence or testimony to support these costs; there is no reason to think these costs are actually incurred, and at least in this case, are clearly not actually incurred and are inflated; its investigator salaries are inflated related to market and thus its costs passed along on this metric are by definition inflated; it does not permit, at least sometimes, attorneys to reduce costs by winning pre-trial motions that would otherwise contain or minimize exposure because it does not rule on them beyond issuing denials devoid of content; and the State Bar System has actually legislated the idea that its black box of (b)(3) costs should be immune from any right to challenge in a palpable abuse of power.

---

[104]   *In re J, supra,* 1993 Calif. Op. Lex. 82, *11.

175.     There are numerous defects and deviations from responsible and legal law practice by OCTC's system of charging costs to attorneys.  Individually or collectively, this practice is abusive.  It contravenes separation-of-powers and due process principles.  In multiple examples, not documented here, attorneys are threatened into submission by the exposure posed by its dubious cost schedule, subverting the process of justice itself – OCTC's own standard to establish its own system-wide ethical violation.

### H.  Meaningless Legal Rulings

#### 1.  The Rulings in the State Bar Court System to Date.

176.     Despite multiple dispositive defects with each of the State Bar's four counts, OCTC pursued its NDC.  Litigation in State Bar Court to dismiss the charges resulted in the following schedule of 12 rulings:

| TABLE 3 – INVENTORY OF RULINGS | | | | |
|---|---|---|---|---|
| **No.** | **DATE FILED** | **FILING** | **COURT** | **RULING** |
| 1. | 2020-09-18 | Motion to Dismiss Cts. 1-4 | State Bar Hearing Dept. | Denied.[105] |
| 2. | 2020-12-08 | Interloc Petition re Cts. 1-4 | State Bar Review Dept. | Denied.[106] |
| 3. | 2021-03-04 | Petition to Reconsider | State Bar Review Dept. | Denied.[107] |
| 4. | 2021-04-01 | Petition for Review | Cal. Supreme Court | Denied.[108] |
| 5. | 2021-07-28 | Motion to Dismiss Ct. 1 | State Bar Hearing Dept. | Denied.[109] |
| 6. | 2021-08-03 | Motion to Dismiss Ct. 2 | State Bar Hearing Dept. | Denied.[110] |
| 7. | 2021-07-30 | Motion to Dismiss Ct. 3 | State Bar Hearing Dept. | Denied.[111] |
| 8. | 2021-08-02 | Motion to Dismiss Ct. 4 | State Bar Hearing Dept. | Denied.[112] |
| 9. | 2021-09-09 | Interlocutory Petition re Ct. 1 | State Bar Review Dept. | Denied.[113] |

---

[105]  Exhibit 13.
[106]  Exhibit 18.
[107]  Exhibit 21.
[108]  Exhibit 41.
[109]  Exhibit 32.
[110]  Exhibit 32.
[111]  Exhibit 32.
[112]  Exhibit 32.

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

| 10. | 2021-09-09 | Interlocutory Petition re Ct. 2 | State Bar Review Dept. | Denied.[114] |
| 11. | 2021-09-09 | Interlocutory Petition re Ct. 3 | State Bar Review Dept. | Denied.[115] |
| 12 | 2021-09-09 | Interlocutory Petition re Ct. 4 | State Bar Review Dept. | Denied.[116] |

177.     Now, it is possible that a State Bar Court litigant might file 11 unmeritorious legal requests and have a 12th petition for review be denied by the Supreme Court without any irregularity, but the problematic aspect about State Bar ethics practice is not the fact of the denials, but the lack of intellectual attention given to them in light of the detailed briefing, as set forth below:

| TABLE 4 – DETAIL OF UNDERLYING BRIEFING | | | | |
|---|---|---|---|---|
| No. | FILING | BRIEFS (PGS)[117] | SUBM'N TOTAL (PGS)[118] | RULING (PGS) |
| 1. | Motion to Dismiss Cts. 1-4 | 72 | 78 | 3 |
| 2. | Appellate Petition re Cts. 1-4 | 78 | 875 | 3 |
| 3. | Petition for Reconsideration | 16 | 18 | 1 |
| 4. | Petition for Review | 29 | 932 | 1 |
| 5. | Motion to Dismiss Count 1 | 27 | 174 | 4[119] |
| 6. | Motion to Dismiss Count 2 | 51 | 489 | 4 |
| 7. | Motion to Dismiss Count 3 | 43 | 292 | 4 |
| 8. | Motion to Dismiss Count 4 | 50 | 1122 | 4 |
| 9. | Appellate Petition re Count 1 | 24 | 259 | 3[120] |
| 10. | Appellate Petition re Count 2 | 29 | 595 | 3 |
| 11. | Appellate Petition re Count 3 | 28 | 371 | 3 |
| 12. | Appellate Petition re Count 4 | 35 | 1234 | 3 |

[113] Exhibit 37.
[114] Exhibit 37.
[115] Exhibit 37.
[116] Exhibit 37.
[117] This is the combined number of pages of briefing (moving papers, opposition and reply) undergirding the motion or appellate petition, excluding exhibits and ancillary filings.
[118] This is the total number of pages of the submissions undergirding the motion or petition, including exhibits.
[119] The single order for items 4-7 is the same 4-page order.
[120] The single order on appeal for items 8-11 is the same 3-page order.

178.     In fact, the rulings are so exceedingly thin and devoid of meaningful content that the substantive text can be reported for the entire universe of 12 rulings in a single table, occupying less than two full pages:

| TABLE 5 – SUBSTANTIVE RULINGS IN STATE BAR COURT | | |
|---|---|---|
| **No.** | **FILING** | **SUBSTANTIVE TEXT** |
| 1. | Motion to Dismiss (Round One) Counts 1-4 | After carefully considering all issues set forth in Respondent's motion, the court finds no basis upon which to dismiss the NDC. The charges are sufficiently pled and Business and Professions Code section 6068, subdivision (b), is not unconstitutional. (*See In the Matter of Anderson* (Review Dept. 1997) 3 Cal. State Bar Ct. Rptr. 775.)  No good cause having been shown, Respondent's motion to dismiss is denied with prejudice. |
| 2. | Petition for Interlocutory Review, Counts 1-4 | After review of the pleadings, we deny respondent's petition for interlocutory review because he has not shown abuse of discretion or error of law by the hearing judge. (Rules Proc. of State Bar, rule 5.150(K).) |
| 3. | Petition for Reconsideration | As respondent has failed to present new facts, circumstances, or law that support his request for reconsideration, his request is denied for lack of good cause. (See Rules Proc. of State Bar, rule 5.150(1) [interlocutory petition may be summarily denied].) |
| 4 | Petition for Review | The petition for review and application for stay are denied. |
| 5-8 | Motion to Dismiss (Round Two) Cts 1-4 | Respondent argues that his statements forming the basis for counts 1, 2, 3 and 4 are protected by the First Amendment and that OCTC, accordingly, committed ethical violations by filing and prosecuting those charges. On these grounds, he asserts dismissal is warranted under this court's inherent authority and rule 5.124(F). In opposing each motion, OCTC argues that the First Amendment claims overlap with those the court rejected in denying Respondent's prior motion to dismiss, and that the request for dismissal is procedurally improper. That Respondent may raise a First Amendment defense to the charges does not mean OCTC committed misconduct by alleging them. Moreover, to the extent Respondent's |

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

| | TABLE 5 – SUBSTANTIVE RULINGS IN STATE BAR COURT | |
|---|---|---|
| **No.** | **FILING** | **SUBSTANTIVE TEXT** |
| | | arguments for dismissal based on the First Amendment may be distinct from those rejected previously, they nevertheless require consideration of factual evidence and, thus, are not suitable for disposition by motions to dismiss. (*In the Matter of McCarthy* (Review Dept. 2002) 4 Cal. State Bar Ct. Rptr. 364, 376 [no pretrial summary judgment procedure available in State Bar Court proceedings]; *In the Matter of Tady* (Review Dept. 1992) 2 Cal. State Bar Ct. Rptr. 121, 125 [appropriate time for attorney to present evidence in defense is at merits hearing].) On these bases, Respondent's motions to dismiss counts 1, 2, 3 and 4 are DENIED with prejudice. |
| 9-12 | Petition for Interlocutory Review (Round Two) Counts 1-4 | Previously, on December 9, 2020, respondent filed a petition for interlocutory review of a November 25, 2020 Hearing Department order denying his motion to dismiss the NDC filed in case number SBC-20-O-30496, and related requests for judicial notice. On February 18, 2021, we denied the petition as respondent had not shown abuse of discretion or error of law by the hearing judge. (Rules Proc. of State Bar, rule 5.150(K).)1 On March 4, 2021, respondent filed a request for reconsideration of our February 18, 2021 order denying his petition for interlocutory review. On March 19, 2021, we denied that request because respondent failed to present new facts, circumstances, or law to support his request for reconsideration. As to respondent's September 9, 2021 filings, we grant his request to file an oversize brief and deny his four petitions for interlocutory review. The petitions largely duplicate respondent's previous petition and fail to demonstrate abuse of discretion or error of law by the hearing judge. (Rules Proc. of State Bar, rule 5.150(K).) |

179.    As can be readily seen from the above text, these rulings are nothing more than a hollow and meaningless denial of the motion: there is no statement of the facts, no legal analysis, no application of the law to the facts, no specific response to each

argument, no findings of any substance, and no set of countervailing or explanatory citations.  In short, these rulings are meaningless.

180.    It is unclear why in a dozen detailed legal submissions, none of which can be dismissed as folly or frivolous considering *Yagman*, the state-side State Bar Court seems disinterested in these arguments, given that federal law imposes controlling legal principles applicable to the factual situation at bar.

181.    As discussed above, and as demonstrated by this case, the State Bar Court system does not handle the process of adjudication with the same seriousness, detail and attention that a judge receiving 91% of the salary of a state superior court should.

182.    Nearly a dozen rulings in this case have consisted of hollow platitudes in the face of serious constitutional arguments.[121]  As such, the adjudication aspect of the State Bar Court system as practiced in this case does not constitute a legal system that is sufficiently merits-based by adhering to minimum state and federal due process standards.[122]

## I. Bootstrapping

183.    Under the State Bar's charging standards, OCTC can file charges over literally anything it considers "unjust."

184.    Once the State Bar system files charges, and in the vast majority of cases, this results in a stipulation that places the attorney on the system's version of parole.

---

[121]  Exhibits 13, 18, 21, 32, 37, 41

[122]  *San Bernardino v. Superior Court,* 232 Cal.App.3d 188, 202 (1991) [legal systems must accord with constitutional principles of due process and fundamental fairness]; *Brown v. Mississippi*, 297 U.S. 278, 285-286 (1936) [finding due process violation for court system that was merely a "pretense"]; *Ciechon v. Chicago*, 686 F.2d 511, 521 (7th Cir. 1982) ("All these irregularities add up to a case slanted from the start against plaintiff, heard by a kangaroo court, and denying her due process"); *Little Horn State Bank v. Crow Tribal Court*, 690 F.Supp. 919, 923 (D. Mon. 1988) ["The Crow Tribal Court … has made no pretense of due process or judicial integrity. Plaintiff was met … with a blatantly arbitrary denial of any semblance of due process. The tribal judge's conduct makes a mockery of any orderly system of justice, and renders any attempt to deal with the Tribe in a professional and competent manner a farce."].

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

However, unlike criminal justice systems, where a failure to adhere to one of the often many small obligations inherent in parole situation, the matter is not treated with the modesty of a parole violation.

185.    Rather, under State Bar practice, every parole violation is grounds to file a new ethics charge, which subjects the attorney to another protracted legal proceeding including the obligation to go to trial given pretrial procedures that are too weak to constitute any real ability to dismiss invalid cases without a trial.

186.    Grounds to find a parole violation can be for the tiniest things: a requisite State Bar filing that is one day late can trigger new charges.

187.    These new charges, which then result in new convictions, can then be used toward an attorney's eventual disbarment, which requires but two "priors" before disbarment is presumptively warranted.[123]

188.    This is a federal constitutional problem because systems that "bootstrap" their way to increased punishments are themselves subject to arguments that they are unconstitutional.[124]  In other words, an attorney might legitimately quality to be disbarred under state law upon three separate ethics offenses but it does not appear to be legitimate as a constitutional matter for an attorney to be disbarred based on one ethical transgression and then two inconsequential failures to comply with the terms of parole that are charged, litigated and adjudicated as if they are independent ethical offenses.

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

---

[123]  Standards for Attorney Sanctions for Professional Misconduct, Standard 1.8(b).
[124]  *Cf. In re S*., 69 Cal.App.3d 866, 870 (1977)

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

# IX.

## SECOND CLAIM FOR RELIEF

### THE CHARGE IN COUNT ONE OF THE NDC CONSTITUTES A VIOLATION OF THE UNITED STATES CONSTITUTION'S FIRST AMENDMENT

189.     Plaintiff incorporates paragraphs 1-116, as if fully set forth into this cause of action.

190.     The basis of this Bar prosecution is founded on an exercise of Plaintiff's exercise of his constitutional rights, including but not limited to, the First Amendment rights to use English adjectives (and to have them mean what the adjective form of the word logically means), the right to draw inferences from evidence, the right to express oneself in the form of rhetorical hyperbole, the right to express opinions (that cannot be proven true or false), the right to report one's own subjective perception of events (such as a perception that a judge apparently attempted to thwart appellate review), and the right to speak the truth in plain terms.

### A.   The Meaning of the Phrase the "Ruling's Succubistic Adoption of the Defense Position" is Limited by the English Language to a Non-Sexual Criticism of the Ruling.

191.     A succubus is a noun.   When used as an adjective, in which a judicial ruling was characterized as succubistic, it is not a fair or accurate tactic to simply overlook this change of grammar roles and act as if the phrase is still a noun, means what it means as a noun, and refers to the ruling's author instead of the adjective it modifies.

192.     It is irresponsible to simply change the meanings of words by jumping from an adjective to a noun, by declining to do the real work of assembling a set of reasonable meanings when a noun is employed as an adjective.

193.     To the complaining judge, a promiscuous ruling means the judge is promiscuous.   A sanitary ruling means the judge is hygenic.   An incestuous ruling means the judge is sleeping with a sibling.   And a succubistic ruling means the judge is a succubus.

194.    Respectfully, these interpretations represent exegetical nonsense.

195.    As an adjective describing an inanimate noun, sexualized words take on a non-sexual character: for example, insatiable female versus insatiable appetite; promiscuous argument versus promiscuous cheerleader; or sexy actress versus sexy argument.

196.    The word "succubus" possesses attributes that can be logically applied to a judicial ruling, and when they are applied as adjectives describe inanimate objects nouns, lose any sexual connotation they might have possessed in their noun form thereby foreclosing a "gender bias" argument.

197.    As the language itself states, the ruling was perceived to be an adoption of the defense position, so it would be reasonable to infer that the adjective succubistic adds the thought that the adoption was so close, it was as if the two positions were metaphorically inseparable.  This is consistent with the way the term promiscuous is handled.

198.    A second reasonable interpretation of a succubistic adoption of the defense position is that the adoption is wrongful or especially unacceptable.

199.    Because a logical interpretation of the adjective succubistic permits several real and fair qualifiers to the phrase "adoption of the defense position," it is not fair or accurate to simply ignore this reality and act as if a word used as an adjective has jumped out of its sentence and stands alone as a noun, or maintains the same sexual definition it held as a noun, especially when that makes no sense.

200.    Judicial rulings are not sexual objects.  A "sexy" argument does not have the same properties of a sexual being; ergo, a succubistic adoption of a legal position does not cause the adoption to have the same properties of a succubus.  Even if it did, which would make no sense, that does not mean the author has those properties.

201.    The sentence in question was clearly written as a criticism *of the ruling*. OCTC's decision to treat the term as a noun is misguided, by the authority vested in all persons that understand the role of adjectives and nouns in the English language.

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

**B.  Assuming the Word Were Intended to Imply or Refer to the Judge as a Succubus, This Still Falls within the First Amendment.**

202.     To the extent that calling a trial judge a succubus implies that she is or has properties of a succubus, or any other metaphysical characteristic, this characterization is simply not, realistically, a factual criticism.  Without being a real attack, such a description clearly falls into the rhetorical hyperbole doctrine, as established in *Hustler*[125] and *Yagman*.[126]

**1.  Derivative Gender Insults**

203.     The State Bar treats the expression in question as an assault on the judge's personal sexual identity.  To the Bar, counsel labeled the OC trial judge "overly aggressive," "predatory," a "hyperaggressive female demon attempting to engage in carnal intercourse with men" (a "deeply misogynistic image"), and engaging the "insidious tactic of attacking the judicial officer's competence based upon harmful and derogatory stereotypes."

204.     Even treating the subject adjective as a direct reference to the judge, this is not a reasonable interpretation.  There is no modern *stereotype* about mythical, demonic women seducing sleeping men.  The folklore of the subject term can be taken only as seriously as any fable.

205.     Regardless, the intended meaning can be objectively ascertained.  The subsequent briefs lay out counsel's criticisms in appellate-caliber detail.  There are no gender references in the later briefs; no nefarious appeals to gender stereotypes in order to win the case by the underhanded tactics envisioned by the Bar; no continuation of

---

[125] *Hustler Magazine v. Falwell* (1988) 485 U.S. 46, 48

[126] *Standing Committee v. Yagman* (9th Cir. 1995) 55 F.3d 1430, 1437-1440; *see also In re Anderson* (1997) 3 Cal. State Bar Ct. Rptr. 775, 1997 Calif. Op. Lexis 5, *16 ["criticism by an attorney which amounts to an attack on the honesty, motivation, integrity, or competence of a judge who has the responsibility to administer the law may still be disciplinable under certain circumstances" [but those circumstances are limited by *Yagman* and may, according to *Anderson*, require impact on the administration of justice, also a fatal problem here].]

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

some idea to sexualize the trial judge, demonize her, paint her as predatory, or invoke stereotypes about "hyperaggressive females."

206.    Petitioner's actual criticism as clarified in the briefs is a logical continuation of the statement in the notice of appeal, one consistently directed at the accuracy of the ruling.

207.    After the notice, which essentially communicated that the ruling was palpably inaccurate, the briefs corroborate and continue a detailed chronicle of the ruling's numerous, particular legal, factual and evidentiary infirmities.

208.    Consequently, the *Martinez* briefs do not support the Bar's hypothesis that counsel actually harbored any of its encyclopedic gender-related grievances with the OC trial judge.

209.    All of counsel's expressions of those grievances throughout the appellate process coalesce around the same basic complaint, to wit, that the ruling was infirm because it was profoundly inaccurate in a litany of particulars – not because somehow the judge's gender warranted any particular consideration.

210.    Moreover, the protracted litigation that this single sentence has prompted, which has now required years of litigation and many hundreds of attorney hours, is the kind of unbelievable waste of resources that also signals that a system has abandoned any sense of ethical priority – particularly since profoundly serious, *real* ethical wrongs (in the form of millions of dollars of misappropriated client funds) were not prosecuted in the Girardi scandal and potentially in an unknown number of other big firm cases.

211.    To the extent OCTC's prosecution is based on "manifesting gender bias," at least one other court has deactivated this phrase as a viable foundation to interfere with constitutional free speech rights.[127]

212.    And again, if one actually studies the message that was being communicated, the criticism was not that Plaintiff had a problem with female judges or actually harbors gender bias toward her or any woman, it is that counsel responded to a

---

[127]   *Greenberg v. Haggerty* (E.D. Pa 2020) Case No. 2:20-cv-03822-CFK, Dkt. 20.

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

judicial officer's controversial decision to write a judicial opinion as if one side was 100% correct, protested the tactic of engaging in "judicial advocacy" by treating one side as completely wrong and the other as completely right, and in the process, generated a "lusty and imaginative" attack on the accuracy of the ruling.

213. Regardless, the Bar system proposes to label an experienced litigator as a misogynistic Neanderthal, one openly trying to win a case by appealing to gender stereotypes. This is ridiculous. The far more nuanced language in reality expresses a point that has nothing to do with gender.

## C. B&P 6068(B) Is Unconstitutional. Its Operation Is Unenforceable in Light of the Irreconcilable Nature of the Infinite Range of Criticisms That May Cause a Person To Feel "Disrespected."

### 1. B&P 6068(b) is Overbroad

214. In a constitutional challenge to the overbreadth of a law, the Court's task is to determine whether it reaches a substantial amount of constitutionally protected conduct."[128]

215. Here, it is hard to imagine a term, "due respect," that is broader. It sweeps within its confines virtually any and every statement any judge might be offended by, for any reason. Judges – that is people – may feel "disrespected" for an unlimited number of reasons:

    (a)   by comments they consider to be insulting, to their integrity,[129] to their independence (asserting bias),[130] to others,[131] to the judiciary in

---

[128] *United States v. Wunsch* (9th Cir. 1996) 84 F.3d 1110, 1119.

[129] *In re Buckley* (1973) 10 Cal. 3d 237, 244 ["So merely stating I knew the law, merely emphasized the fact that I had no integrity"]; *In re Ciraolo* (1969) 70 Cal.2d 389, 394-395 (false accusation in affidavit); *Hume v. Superior Court* (1941) 17 Cal.2d 506, 513-514 (false charge of collusion of judge with Attorney General); *Blodgett v. Superior Court* (1930) 210 Cal. 1, 16 (false charge of corruption); *Lamberson v. Superior Court* (1907) 151 Cal. 458, 462-464 (affidavit to disqualify judge charging corrupt and improper motives); *Matter of Shay* (1911) 160 Cal. 399, 407-408 (false statements impugning reputation of judges).

[130] *In re Buckley* (1973) 10 Cal. 3d 237, 244.

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

general,[132] or for any other "impertinent, scandalous, insulting or contemptuous language"[133];

(b)   ones that challenge their power, their prestige, their standing, or their authority;[134]

(c)   ones that send an impermissible message to the public, to the judiciary, to other lawyers[135], or to the exact people in the room;[136]

(d)   criticisms of objects related to them, such as judicial rulings, along a continuum, starting with mild criticism, such as characterizing the ruling as "illegal" or "unlawful,"[137] – which is practically the job of an appellate lawyer – to criticisms that are viewed as an *ad hominem* attack on the judge herself.[138] [139]

216.   Within this gigantic umbrella of speech that the statute ropes in as potentially an ethics violation, almost the entire universe is in fact permissible in light of existing federal First Amendment principles.

217.   Addressing just category (1), direct insults about the judge, *Yagman* held that calling a judge "ignorant," "ill-tempered," a "buffoon," a "sub-standard human," a

---

[131] *Snyder v. State Bar* (1976) 18 Cal.3d 286, 289 [calling opponents "flannel-mouth" and "The Mouche" and referred to opposing counsel as "alleged attorneys."]; *In re Koven* (2005) 134 Cal.App.4th 262, 268.

[132] *In re Friday* (1934) 138 Cal.App. 660, 663 (attorney accused judge of meeting with opposition counsel, whereas attorney only actually in chambers to pick up a piece of paper).

[133] *Hume v. Superior Court* (1941) 17 Cal.2d 506, 513-514.

[134] *Moody v. Staar* (2011) 195 Cal.App.4th 1043, 1048; *Martinez v. California* (2015) 238 Cal.App.4th 559, 568-569; *Hogan v. State Bar* (1951) 36 Cal. 2d 807, 809 [lawyer insulted judge by calling him "petty"].

[135] *Snyder v. State Bar* (1976) 18 Cal.3d 286, 289 [calling opponents "flannel-mouth" and "The Mouche" and referred to opposing counsel as "alleged attorneys.")

[136] *See Berner v. Delahanty* (1st Cir. 1997) 129 F3d 20, 27 [prohibiting political buttons in court]

[137] *Ramirez v. State Bar* (1980) 28 Cal.3d 402, 411.

[138] *See Martinez v. O'Hara* (2019) 32 Cal.App.5th 853, 855.

[139] This category opens a much larger can of worms.  This body encompasses an almost unlimited amount of speech, as once you start changing the words to something other than what they say, the number of 'meanings' that can be generated is limitless.

---

"right-wing fanatic," a "bully" and "one of the worst judges in the United States" was all permissible criticism.[140]

218.    Yet, in direct contradiction to these principles, lawyers have been cited in state court for calling rulings "illegal,"[141] for calling judges "petty,"[142] for suggesting a court engaged in "intellectual dishonesty,"[143] for suggesting a court sought to "thwart review,"[144] and for myriad other garden variety insults that utterly fail constitutional barriers erected by *Bridges*, *Gentile*, *Hustler* and *Yagman*.

219.    Furthermore, the cases that cite lawyers without regard for governing First Amendment principles seem generally unconcerned with another major hurdle: truth.  At least some of these cases involve an insult toward a judge that is true, including this one.

220.    All judges are human and so by definition some *are* corrupt,[145] some *are* petty,[146] and some judges *are* overly result oriented.[147]  Yet the statute and the California case law analyzing attorney insults makes almost no room for this.  The California case law pretty much treats the truth or the falsity of the attorney's claim as if it is irrelevant. But it's not irrelevant – *truth is an absolute defense*.[148]

221.    This glaring omission in the statute and feature largely absent from the California case law result in section 6068(b) criminalizing permissible speech and therefore causing its overbroad application relative to normative constitutional limitations.

---

[140]  *Standing Committee v. Yagman* (9th Cir. 1995) 55 F.3d 1430, 1440.
[141]  *Ramirez v. State Bar* (1980) 28 Cal.3d 402, 411.
[142]  *Hogan v. State Bar* (1951) 36 Cal. 2d 807, 809.
[143]  *In re Koven* (2005) 134 Cal.App.4th 262, 268.
[144]  *Martinez v. O'Hara* (2019) 32 Cal.App.5th 853, 855.
[145]  *See Adams v. Comm'n on Judicial Performance* (1994) 8 Cal.4th 630, 641.
[146]  *See, e.g., Martinez v. O'Hara* (2019) Case No. G054840, Slp. Opn, p. 10 [denying Martinez's fee application because the case was not filed in limited civil, even though the complaint pled for injunctive relief and *was required* to be filed in unlimited].
[147]  *See Standing Committee v. Yagman* (9th Cir. 1995) 55 F.3d 1430, 1441 and fn. 19.
[148]  *Standing Committee v. Yagman* (9th Cir. 1995) 55 F.3d 1430, 1438, *citing Garrison v. Louisiana* (1964) 379 U.S. 64, 74 *and Philadelphia Newspapers v. Hepps* (1986) 475 U.S. 767, 776-777.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

222. Thus, without even reaching categories (2)-(6), which are gradually more controversial in terms of being viable as 6068(b) violations, just an analysis of prong (1) reveals that 6068(b) encompasses a substantial amount of constitutionally protected speech.

223. Consequently, such a restriction is unconstitutional unless it is "fairly subject to a limiting construction."[149]  However, Respondent is unaware of any limitations that California has read into 6068(b).  As far as the State Bar is concerned, *Ramirez*, the case faulting a lawyer for calling a ruling "illegal" and "unlawful," is good law.[150]  The State Bar appears to also believe that *Hogan* is good law, where the judge was called "petty."[151]  The *Martinez* court seems to think that almost any "offensive" or "contemptible" language can constitute a 6068(b) violation – it referred the arguments in two entire legal briefs, some *33 statements* charged, as putatively constituting 6068(b) violations.[152]

224. This overreach underscores the need to invalidate the statute, as the Ninth Circuit did with respect to 6068(h).  *Yagman* treats virtually all such vitriol as encompassed within the First Amendment.[153]  Accordingly, although there is a considerable body of California case law addressed to section 6068, none of it really limits the statute's reach.[154]  Attorneys should treat judges with respect.  This is important to maintaining one's professional standing and reputation.  Almost invariably, they do.  But legislating it as law presents serious constitutional problems.

---

[149] *Standing Committee v. Yagman* (9th Cir. 1995) 55 F.3d 1430, 1437, *citing Airport Comm'rs v. Jews for Jesus,* 482 U.S. 569, 577, 96 L.Ed.2d 500, 107 S.Ct. 2568 (1987).

[150] *Ramirez v. State Bar* (1980) 28 Cal.3d 402, 411.

[151] *Hogan v. State Bar* (1951) 36 Cal.2d 807, 809.

[152] *See Martinez v. O'Hara* (2019) 32 Cal.App.5th 853, 855; *In re White* (2004) 121 Cal.App.4th 1453, 1456.

[153] *Standing Committee v. Yagman* (9th Cir. 1995) 55 F.3d 1430, 1440.

[154] *See, e.g., Martinez v. O'Hara* (2019) 32 Cal.App.5th 853, 855.

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

225.     In 1996, the Ninth Circuit characterized the California case law about subdivision *(h)*, pertaining to "offensive personality," thusly: 6068(h) "fails to reveal a single controlling decision – much less a clear line of authority – that either specifically discusses the scope of section 6068(f) or explicitly limits its applicability to, *e.g.*, courtroom interactions."[155]

226.     A perusal of the state case law reveals that 6068(b) has just as many applications, is just as broad, is just as vague, sweeps in just as much permissible speech, and is supported by a body of California case law that just as equally as 6068(h) interposes no limits on its reach.  Mild criticisms are violations.[156]  Opinions are violations.[157]  Criticism apart from the judge's character are violations.[158]  Criticism that is part of an appellate attorney's job can result in charges.[159]

227.     In fact, in Respondent's research, counsel does not recall a single case in which the state courts did *not* find a violation.  Yet, the federal constitutional rules under *Bridges*, *Gentile*, *Hustler* and *Yagman* repudiate virtually the entire body of state case law, leaving at most a single channel of enforceable 6068(b) speech misconduct: criticism asserting specific, factual, objectively provable, corruption-related crime.[160]

228.     Because of the vast net of permissible speech that the broad 6068(b) terminology linguistically encompasses, an extensive body of case law that nevertheless fails to limit its reach, and the fact that the state-side State Bar Court refuses to even admit exists in this case,[161] the statute is unquestionably unconstitutionally overbroad, in theory and as practiced here.

---

[155]  *United States v. Wunsch* (9th Cir. 1996) 84 F.3d 1110, 1118.

[156]  *Ramirez v. State Bar* (1980) 28 Cal.3d 402, 411 [characterizing a trial ruling as "illegal" or "unlawful" appears in probably half of the nation's appellate briefs].

[157]  *Hogan v. State Bar* (1951) 36 Cal.2d 807, 809.

[158]  *See* Exhibit 12.

[159]  *See Ramirez v. State Bar* (1980) 28 Cal.3d 402, 411.

[160]  *Standing Committee v. Yagman* (9th Cir. 1995) 55 F.3d 1430, 1440, *citing Cianci v. New Times* (2d Cir. 1980) 639 F.2d 54, 64.

[161]  In the 11 decisions associated with this case, all of which warranted an extensive discussion of federal limitations on B&P 6068(b), not one ruling cited even one

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

### 2.  B&P 6068(b) is Vague.

229.    A related problem with the constitutionality of 6068(b) is that it is vague. The rule fails to provide "fair notice" of what is prohibited.[162]  Lawyers must guess at its contours.[163]  "Due respect" is an obligation of degree.[164]  Concerns about litigating "taste" abound.[165]  A lawyer has no fixed principle for objectively determining when a criticism passes from permissible to impermissible.[166]  There is no settled usage of the term because California state law and federal case law contradict each other.[167]  A comment that ignites one judge into Biblical abomination mode[168] could have been another judge's comedic kerfuffle.[169]

---

federal case. See Exs. [2020-11-25, 2021-02-18, 21-3-19, 21-06-07, 21-08-27, 21-09-16]

[162] *Gentile v. State Bar* (1991) 501 U.S. 1030, 1048, *citing Grayned v. Rockford* (1972) 408 U.S. 104, 112.

[163] *Gentile v. State Bar* (1991) 501 U.S. 1030, 1048.

[164] *Gentile v. State Bar* (1991) 501 U.S. 1030, 1048.

[165] *Hustler Magazine v. Falwell* (1988) 485 U.S. 46, 53-55.

[166] *Gentile v. State Bar* (1991) 501 U.S. 1030, 1048-1049, *citing Grayned v. City of Rockford* (1972) 408 U.S. 104, 112.

[167] *Compare Standing Committee v. Yagman* (9th Cir. 1995) 55 F.3d 1430, 1437-1441 *to Ramirez v. State Bar* (1980) 28 Cal.3d 402, 411 *and Hogan v. State Bar* (1951) 36 Cal.2d 807, 809.

[168] *Martinez v. O'Hara* (2019) 32 Cal.App.5th 853, 855 [treating succubus reference as a literal demonic incantation].

[169] "*Succubus (Dungeons and Dragons 5th Edition)*," Succubus.net, Website: http://www.succubus.net (September 16, 2020) [relating the succubus' role as a character to be confronted in the (teenage) fantasy role-playing game, "Dungeons & Dragons"]; *see, e.g.*, Marshall, Jack, "*Ethics Quote Of The Week: California Attorney Benjamin Pavone*," Ethics Alarms, Website: https://ethicsalarms.com (March 5, 2019) [chuckling about the colorful language].

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

230.     Established principles of federal constitutional law, such as the latitude to engage in rhetorical hyperbole,[170] are poorly understand and almost never applied on the state side.[171]

231.     In this case, instead of undertaking a serious First Amendment analysis based on the right of lawyers to dream up "lusty and imaginative" criticisms, the state judges in this case decided to nationally lambast undersigned counsel as a misogynist, while cynically burying in a footnote the legal reality that the gender rule they were enforcing post-dated the offense in question.[172]

232.     In summary, the failure of the California case law, including in this case, to produce 6068(b) opinions that respect First Amendment limitations leave it open to be enforced in a vague, constitutionally unacceptable manner.  It should be invalidated as a result.

## X.

### THIRD CLAIM FOR RELIEF

### THE CHARGE IN COUNT TWO OF THE NDC CONSTITUTES A VIOLATION OF THE UNITED STATES CONSTITUTION'S FIRST AMENDMENT

233.     Plaintiff incorporates paragraphs 116, as if fully set forth into this cause of action.

234.     Plaintiff commented in Count Two that counsel "never actually received a copy of a signed judgment, though a stipulated judgment was prepared for the commission court's signature, as it apparently cynically attempted to suppress notice of the judgment in order to thwart review."

---

[170] *Milkovich v. Lorain* (1990) 497 U.S. 1, 17; *Letter Carriers v. Austin* (1974) 418 U.S. 264, 284-286; *Greenbelt. v. Bresler,* 398 U.S. 6, 14 ("even the most careless reader must have perceived that the word was no more than rhetorical hyperbole, a vigorous epithet used by those who considered Bresler's negotiating position extremely unreasonable")

[171] *See Martinez v. O'Hara* (2019) 32 Cal.App.5th 853, 855 [no First Amendment analysis at all for clearly hyperbolic comment].

[172] *Martinez v. O'Hara* (2019) 32 Cal.App.5th 853, 855, fn. 9.

235.     OCTC's Count Two also fails multiple constitutional barriers.

236.     The sentence includes the term "apparently," in other words, how the situation appeared to Plaintiff.

237.     By definition, how a situation appeared to the author cannot be false; and why that situation appeared as it did to Plaintiff was based on undisputed facts: that were disclosed, namely, the court did not serve the signed judgment and so it appeared to Plaintiff as if the Commissioner tried to run out the appellate clock, as was her right.

238.     OCTC does not seem to appreciate that even if counsel had stated definitively that the 'thwarting review' criticism was a concrete fact, it could not by definition be a criticism of the judge's honesty, integrity or adherence to the law, because such thwarting is legally permissible,[173] all as elaborately detailed in an appellate petition filed in State Bar Court.[174]

## XI.

## FOURTH CLAIM FOR RELIEF

### THE CHARGE IN COUNT THREE OF THE NDC CONSTITUTES A VIOLATION OF THE UNITED STATES CONSTITUTION'S FIRST AMENDMENT

239.     Plaintiff incorporates paragraphs 116, as if fully set forth into this cause of action.

240.     The *Martinez* briefs alleged a uniform and invariable series of major judicial errors.  In response, counsel argued that the Commissioner was engaged in intellectual dishonesty.

241.     OCTC seems to act as if accusations of intellectual dishonesty are categorically impermissible.  This is not the law after *Yagman*.[175]

**Fact**: The OC trial judge ruled against Martinez on every single issue.

---

[173]  *See* California Rules Ct., Rule 8.104(a).
[174]  *New York Times v. Sullivan* (1964) 376 U.S. 254, 279-280; Exhibit 34.
[175]  *Standing Committee v. Yagman* (9th Cir. 1995) 55 F.3d 1430, 1441 *and* fn. 19.

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

**Fact**: it is statistically a 1/1024 chance that on issues with a 50/50 coin toss of legal merit as between competing parties that a judge would have occasion to rule against one party on every issue, across 9 separate issues. In other words, it is a very unlikely event.  As such, to do so, a judge almost by definition must be engaged in intellectual dishonesty when such an event occurs, especially as here where OCTC cannot even bring itself to debate Plaintiff on the asserted errors; and

**Fact**: some of the issues were so basic that it is impossible to believe that a sitting judge would *accidentally* make such a mistake.[176]

242.      Given an accurate assessment of the Commissioner's position, there is no possibility that counsel's intellectually-dishonest concerns can be considered so inaccurate that it would fail *New York Times*[177] recklessness standards.

243.      Accordingly, a truthful criticism (or at least one that is not recklessly inaccurate) was within counsel's constitutional rights.  A prosecution for such exercise therefore violates the First Amendment, as elaborately set forth in a detailed appellate petition establishing this count's constitutional defects, incorporated herein.[178]

**XII.**

**FIFTH CLAIM FOR RELIEF**

**THE CHARGE IN COUNT FOUR OF THE NDC CONSTITUTES A VIOLATION OF THE UNITED STATES CONSTITUTION'S FIRST AMENDMENT**

244.      Plaintiff incorporates paragraphs 116, as if fully set forth into this cause of action.

245.      Detail to invalidate Count 4 is similarly set forth in an appellate brief presented to the Review Department of the State Bar Court, incorporated herein, and reflects that counsel's allegations about intellectual honesty were plainly true: the ruling

---

[176]  For example, chastising counsel for not filing the case in limited civil when that was impermissible given B&P 17200/17500 injunctive causes of action.

[177]  *New York Times v. Sullivan* (1964) 376 U.S. 254, 279-280.

[178]  Exhibit 35.

in question was provably dishonest and can be explained by reference to the procedural history of the case, all as meticulously detailed therein, and re-incorporated here.[179]

**XIII.**

**REQUEST FOR DECLARATORY RELIEF**

246.     In addition to temporary and permanent injunctive relief, Plaintiff seeks declaratory findings to conform the State Bar system to minimum constitutional requirements.

247.     A party seeking declaratory relief must show that he has suffered a concrete and particularized legal harm, coupled with a sufficient likelihood that he will again be wronged in a similar way.[180]

248.     As detailed above, Plaintiff, and many Bar targets, have been subjected to the unconstitutional rules, procedures and practices of the State Bar Court system.  By definition, there is a risk that future violations will occur as OCTC and the Bar Court carry out their existing rules, procedures and practices, including Plaintiff and including to other Bar targets.  For this reason, there is adequate cause to grant Plaintiff declaratory and injunctive relief.

**PRAYER FOR RELIEF**

*Wherefore***,** Plaintiff seeks the following relief**:**

(1)   a finding that Counts 1-4 infringe on Plaintiff's First Amendment constitutional rights;

(2)   a finding that the State Bar system infringes on targeted attorneys' constitutional rights in various particulars, as set forth above;

(3)   a finding that B&P 6068(b) is vague and overbroad.

(4)   an injunction against further enforcement of OCTC's case against Plaintiff in light of the fatal constitutional defects with the charges;

(5)   an injunction requiring the State Bar system to correct or abide by the federal constitution's due process guarantees, as to the particular issues identified above;

---

[179]  Exhibit 36.
[180]  *Canatella v. California*, 304 F.3d 843, 852 (9th Cir. 2002).

PAVONE & FONNER, LLP
600 W. BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

(6)   costs of suit;

(7)   attorney's fees as available by law;

(8)   such other relief as the Court deems just and proper.


Date: October 6, 2021                                          PAVONE & FONNER, LLP


                                                                  Benjamin Pavone, Esq.
                                                                  Attorneys for Plaintiff